[File No. 6993]

W. H. RICKBEIL, Appellant, v. GRAFTON DEACONESS HOSPITAL, a Corporation, and ALBERT G. TVERBERG, Respondents.

(23 NW2d 247, 166 ALR 99)

Opinion filed May 22, 1946.   Rehearing denied June 15, 1946

*Lyche & Lyche,* for appellant.

*Day, Lundberg & Stokes,* for respondents.

528

BURR, J. Plaintiff appeals from an order and judgment dismissing this action at the close of his case and demands "a new trial of the issues of law and fact."

Plaintiff complains: that the defendants combined to vex and annoy him; and did falsely, intentionally, and maliciously publish and circulate this letter addressed to him:

"Board of Trustees

GRAFTON DEACONESS HOSPITAL

Grafton, N. Dak.

Trustees                                                   Officers

. . . . . . . . . . . . . . . . . .               . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . .                . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . .                . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . .               . . . . . . . . . . . . . . . . .

Albert G. Tverberg,
Secretary
Grafton, N. Dak.

February 16, 1939

W. H. Rickbeil
Hamilton, N. Dak.

Dear Sir:

I am calling your attention to the unpaid hospital bill of Julia Sagert, amounting to $301.24.

As this girl received treatment following a criminal operation and for which you were responsible, we hereby request and demand that you make immediate payment of this bill. If you fail to do so, we will institute criminal proceedings and use our best efforts to see that you are committed to the State Penitentiary. This is a final notice and your immediate attention is requested.

Yours truly,<br>A. G. TVERBERG<br>A. G. Tverberg

agt/1                      Secretary"

He alleges he has been and is greatly injured thereby and has lost gains and profits which would otherwise have arisen and accrued to him in his business to his damage in the sum of Ten Thousand Dollars ($10,000.00).

The defendants answer separately. The hospital states: it is a charitable non-profit corporation; that its codefendant "acts entirely in an independent capacity so far as the collection of outstanding accounts is concerned;" that it has no control over such activities; that the letter which is the basis of the plaintiff's complaint "was not ordered, consented to, approved or ratified" by it; that any allegedly defamatory words stated are merely in their natural, ordinary and intended meaning, a statement that the plaintiff had assumed the responsibility for the hospital account referred to; that its codefendant was justified in believing and honestly believed the statements made therein were true; and if the plaintiff has been injured the injury was caused by his own acts in circulating "distorted and unwarranted versions of statements supposedly made by said Albert G. Tverberg and were not due to any act or omission" on its part.

The defendant Tverberg answers to the same effect and adds that the plaintiff well knew he "had assumed responsibility for the hospital account;" knew the statement of responsibility referred to this and not to any criminal act; that while some of the facts connected with the incidents described in the letter

may have had reference to another Rickbeil, plaintiff's son, the similarity of names and plaintiff's acts and the conditions and circumstances which plaintiff allowed to arise and exist, justified him in forming the opinions and beliefs which he held as above stated.

A jury was empanelled. The only witnesses in the case were the plaintiff, and the defendant Tverberg called for cross-examination under the statute.

Defendant Tverberg was the secretary of the Board of Trustees of the hospital and as such had charge of the collection of accounts and bills due the corporation. As such secretary and collector he dictated the letter to his stenographer. The stenographer took the dictation in shorthand, was required to transcribe her notes and typewrite the letter which she did. The letter was registered and received by the plaintiff through the mail.

The record shows further that the girl named in the letter had worked for the plaintiff for about three years; a criminal operation for an abortion had been performed upon her; plaintiff's daughter had been convicted of participating in this criminal act; the girl was sent to this hospital but died as a result of this operation; and the plaintiff agreed in writing to pay the hospital charges. There is no proof that the plaintiff had anything to do with the condition of the girl or knew anything about the criminal operation at the time of occurrence. The defendant's name is William Henry. He had two sons—named Herman and Albert respectively. On cross examination there was an attempt to show one of these sons was responsible for the condition of the girl who died, but there is no proof thereof in the case.

At the close of the plaintiff's case the defendants moved the court to dismiss the action on the following grounds:

1. "That the letter upon which the suit is brought is not libelous per se, that therefore to sustain the case it is necessary to prove damage and that there has been no proof of damage.

2. That there is no evidence whatever of publication which is an essential element of libel.

3. That the evidence does not prove the material allegations of the complaint."

Plaintiff moved to reopen his case for the purpose of offering further testimony regarding the publication to show the defendant Tverberg "reiterated and reaffirmed orally to numerous people" the statements made therein; to show plaintiff had suffered mentally from the publication of this statement; and to furnish proof as to damages for mental suffering. There was nothing presented to the court as basis for this motion and the court denied it.

The defendants moved further for dismissal on this ground: "with reference to the defendant Hospital only, we urge as a further ground for dismissal as to that defendant, that since this was a collection letter, and since all communications had under the proof, communications as between the Superintendent of the Hospital and another employee of the Hospital in the usual course of their duties, the communication and all acts performed were privileged or qualifiedly privileged."

The court took the matter under advisement and later granted the motion, on the ground, as shown by the memorandum opinion, that the dictation of the letter to the stenographer who transcribed her notes and wrote the letter at the order of the secretary was not "publication" of a libel.

There was another point determined by the court—the non-liability of the corporation for the act of its secretary and collector—there being no proof showing the trustees or any of them knew about this letter, ordered it to be written, or ratified the act of the secretary.

"Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided or which has a tendency to injure him in his occupation." Section 14-1203, Rev Code.

The trial court in the memorandum opinion goes very carefully into the conflicting views with reference to the effects of

dictating such a letter to a stenographer, citing: Ostrowe v. Lee, 256 NY 36, 175 NE 505; Bradley v. Conners, 169 Misc 442, 7 NYS2d 294; Gambrill v. Schooley, 93 Md 48, 48 A 730, 52 LRA 87, 86 Am St Rep 414, and similar cases where it is held that dictation of such a letter to a stenographer who afterwards transcribed the letter from her notes and had the letter mailed, is a publication of a libel and, Freeman v. Dayton Scale Co. 159 Tenn 413, 19 SW2d 255, and other cases to the effect that such dictation does not constitute "publication" in the sense of that term as used in the law of libel.

The trial court reached this conclusion therefrom:

"We are satisfied that the sounder and better supported rules are . . . that the incidental dictation of such a communication to an employee stenographer is not a publication of the libelous matter, . . . the stenographer, if an employee in a corporation, has no distinct third party entity, and, if an employee of an individual, is a confidential instrumentality only of the libelant, not recognized when engaged in the performance of this mainly mechanical duty, as possessing an independent third party personality. And, as a practical proposition, it should be said to the credit of those engaged in this calling, that experience demonstrates that their loyalty and fidelity is universally such that communications confided to them are not disclosed."

When we examine these two lines of approach we find they are not as diametrically opposed to each other as may be supposed at first, the difference arises largely from the conception of the terms. In the New York and other cases the definition is confined to publication merely while in the other line of cases it is largely tinctured with the thought of corporate relationship and of privilege and thus many of the courts, following this latter line of reasoning, hold it is a privileged publication.

The letter charges the commission of crime. The falsity is always presumed. If this expression in the letter, "for which you are responsible," refers to the statement "the unpaid hospital bill" found in the first paragraph and not to the expression "a criminal operation" found in the second paragraph and

which precedes it immediately, this may be shown in defense or in mitigation of damages. .

Where a publication is libelous and unprivileged malice is inferred and the plaintiff is entitled to actual damages, and also punitive damages in the discretion of the jury. McCurdy v. Hughes, 63 ND 435, 248 NW 512; Meyerle v. Pioneer Pub. Co. 45 ND 568, 178 NW 792. Clearly the letter is defamatory and libelous per se.

Was there a publication? Publication of defamatory matter is the communication of the same to a third person. Harbison v. Chicago, R. I. & P. R. Co. 327 Mo 440, 37 SW2d 609, 616, 79 ALR 1; Staub v. Van Benthuysen, 36 La Ann 467, 469. The action may be maintained even if published to one person only. Lindley v. Delman, 166 Okla 165, 168, 26 P2d 751, 754; 33 Am Jur 107, Libel and Slander. To publish is to intentionally exhibit the defamatory words to one other than the libelee. No words more definitely convey the idea requisite in law to support an action for writing defamatory words.

The alleged publication here consists of dictating a letter to a stenographer, having her transcribe her notes and the subsequent mailing of the letter. The plaintiff did not show whether the stenographer was an employee of the defendant Tverberg, or both were coemployees of the corporation.

Assuming first that the stenographer was the employee of defendant Tverberg was there a publication?

In Kiene v. Ruff, 1 Iowa 482 (decided 1856) it was shown that the defendant before mailing a letter to the plaintiff had it copied by his clerk and the court held this was a publication to a third party. "The dictation to a stenographer of a letter which was libelous per se held a publication of the libel." See also Nelson v. Whitten (DC) 272 F 135 (1921).

In State v. McIntire, 115 NC 769, 20 SE 721, it is stated: "Giving letter containing matter defamatory of another to a clerk to copy, which he does, is a publication."

The case of Ostrowe v. Lee, 256 NY 36, 175 NE 505, is considered a ruling case, and the writer Judge Benjamin N. Cardozo, states: "Publication is a term of art," and defamatory

writing is "published" as soon as read by person other than the one defamed. He holds that the· dictation to a stenographer is a publication for it is read by a person other than the one defamed and shows that, "A defamatory writing is not published if it is read by no one but the one defamed. Published, it is, however, as soon as read by any one else." He discusses the proposition that the dictation is slander rather than libel; but the copyist reads the notes which he was directed to take and as Judge Cardozo says, "The author who directs his copyist to read, has displayed the writing to the reader as truly and effectively as if he had copied it himself." This case of Ostrowe v. Lee (NY) supra, was followed in Weidman v. Ketcham, 252 App Div 809, 298 NYS 916, where the court states: "A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however as soon as read by any one else. . . ." This was approved in 278 NY 129, 15 NE2d 427.

Maryland holds: "The dictation of a libelous letter by the defendant to his private and confidential stenographer, by whom a typewritten copy is made and transmitted to the plaintiff after having been signed by the defendant, is in law a publication of the libel, although there is no communication of the letter by the defendant to any other person." Gambrill v. Schooley (1901) 93 Md 48, 48 A 730, 52 LRA 87, 86 Am St Rep 414. The case at bar is almost identical in fact with this case cited. To the contrary is Rodgers v. Wise, 193 SC 5, 7 SE2d 517, where a lawyer dictated an alleged libel to his stenographer.

In connection with the theory that a stenographer is a third person within the purview of the law of libel it will be noted that in the case of Nelson v. Whitten (DC) 272 F 135, one of the grounds of demurrer to the complaint was that, "inasmuch as the libel was communicated to the defendant's stenographer only, there was no publication, because a stenographer has become such a common, if not necessary, part of the methods of communications in writing, that any letter would be expected to be dictated, if written at all; . . .. ."

The syllabus shows: "The dictation to a stenographer of a letter which was libelous per se held a publication of the libel." With reference to this question the Federal court quotes from Pullman v. Walter Hill & Co. [1891] 1 QB (Eng) 524—CA (Lopes, Ld. J.), and states: "This argument is convincing and is adopted."—the quotation being: "It is said that business can not be carried on if merchants may not employ their clerks to write letters for them in the ordinary course of business. I think the answer to this is very simple. I have never yet heard that it is in the usual course of a merchant's business to write letters containing defamatory statements. If a merchant has occasion to write such a letter, he must write it himself and make a copy of it himself, or he must take the consequences."

In this British case the manager director of the defendant dictated a letter to a clerk, "who took down the words in shorthand and then wrote them out in full by means of a type-writing machine. The letter thus written was copied by an office-boy in a copying press." These are some of the facts. The court held, "That the letter must be taken to have been published both to the plaintiff's clerks and the defendant's clerks . . . ." The lower court had found that there was no publication to defendant's clerks by the managing directory of the defendant and "withdrew the case from the jury." There were three Lord Justices writing opinions in the case. Each held there was a publication to defendants' stenographer and office-boy and that the exigencies of business did not justify the setting aside or the nullification of the rule that there is a "publication" when libelous matter is shown to a third party, even if the third person be a mere stenographer or a copying clerk doing the work he is employed to do.

In 1945, a Supreme Court in New York, in Horovitz v. Weidenmiller, — Misc —, 53 NYS2d 379, 390, was considering a case where it states, "No one saw the letter except the typist . . . who is unknown to the plaintiffs. . . . There was no other publication of the letter by the defendant." The court sustained judgment for the plaintiff; though in merely nominal damages, because of failure to show actual damages and be-

cause of mitigating circumstances. The court held dictating to the stenographer and the subsequent typing was a publication.

In 32 English & Empire Digest 82, we find this rule of law dealing with libel,—"Proof that is was written by deft.'s daughter, who was authorised to make out his bills & write his general letters of business, is not sufficient unless it can be shown that such libel was written with *the knowledge of or by the procurement of deft.; . . . "* (Italics ours.) This statement is based upon three decisions the titles of which are set forth. In the case at bar the stenographer was defendant Tverberg's daughter.

A second point arises when some courts distinguish between cases where the stenographer is an employee of the letter writer, and cases where the letter writer and the stenographer are employees of a common employer.

Courts that hold the stenographer is just a part of the machinery of business, and not a third person in the sense we are now considering it, seem to base their distinctions upon the theory that both the manager and the stenographer are common employees of the corporation; therefore it is the corporation writing to itself, and until an independent third person is shown the letter it is not a publication.

The Supreme Court of Massachusetts, considering opposing views as to the effect of "intra-corporate communication," states, "The argument that a communication between agents of the same corporation is not a communication to a third person is not impressive in dealing with such a subject as defamation and would apply with almost equal force as between two agents of the same individual or partnership." Bander v. Metropolitan L. Ins. Co. 313 Mass 337, 348, 47 NE2d 595, 602. In this Massachusetts case the court considers such cases as the Washington case of Prins v. Holland-North America Mortg. Co. 107 Wash 206, 181 P 680, 5 ALR 451, infra, and others as representative of one type of case and the Maryland case of Gambrill v. Schooley, 93 Md 48, 48 A 730, 52 LRA 87, 86 Am

St Rep 414, supra, and others on the other, and adopts the latter ruling.

This principle was adopted by Alabama in Berry v. City of New York L. Ins. Co. 210 Ala 369, 98 So 291, 292. This was a case where the special agent of the corporation dictated the letter "to a stenographer also in the employ of the defendant. The stenographer put her notes into typewriting. The letter was posted to plaintiff. Its terms were not otherwise disclosed." Here the court says, "The evil effect is in the loss of esteem by the stenographer in person, and not in any relation to the chief agent nor the common employer." It may be that this "loss of esteem" would be practically nothing but that is a matter for the jury.

In Globe Furniture Co. v. Wright, 49 App DC 315, 265 F 873, 18 ALR 772, the court held: "the exhibition by the general manager of a corporation to its collector and bookkeeper, of a letter relating to a customer's account with respect to which each has a duty, is privileged *although libelous*." (Italics ours.) The distinction between a privileged publication of libelous matter and publication itself is not maintained in the note. An examination of the cases cited in the ALR note that follows: shows in most cases that the exhibition of such a letter is a publication, but liability was avoided because of privilege.

In Freeman v. Dayton Scale Co. 159 Tenn 413, 19 SW2d 255, it is held: "the stenographer, if a coemployee in a corporation, has not distinct third party entity, and, if an employee of an individual, is a confidential instrumentality only of the libelant, not recognized, when engaged in the performance of this mainly mechanical duty, as possessing an independent third party personality." This opinion was written in 1929 and has support in the earlier case of Prins v. Holland-North America Mortg. Co. 107 Wash 206, 181 P 680, 5 ALR 451, decided in 1919.

In the Washington case though the court states, "Publication of a libel is the communication of the defamatory matter to some third person or persons." Yet it holds that, "Agents· and employees of this character (an agent of the corporation sent a

libelous communication to another agent at a branch office) are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels. For the time being, they are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the acts of the corporation."

In a case later than State v. McIntire, 115 NC 769, 20 SE 721, supra, the North Carolina court, in Satterfield v. McLellan Stores Co. 215 NC 582, 2 SE2d 709 (decided 1939), holds squarely that the dictation of a libelous letter by the manager of a corporation store to a stenographer is not a publication of either libel or slander even though the stenographer transcribed the letter and mailed it at the dictation of the manager. The theory of the case is that the acts of the manager and the stenographer were but a single act of the corporation. The opinion quotes extensively from the case of Owen v. J. S. Ogilvie Pub. Co. 32 App Div 465, 53 NYS 1033, wherein this doctrine is set forth: "It may be that the dictation to the stenographer and her reading of the letter would constitute a publication of the same by the person dictating it, *if the relation existing between the manager and the copyist was that of master and servant,* and the letter be held not to be privileged. Such, however, was not the relation of these persons. They were both employed by a common master, and were engaged in the performance of duties which their respective employments required. Under such circumstances we do not think that the stenographer is to be regarded as a third person in the sense that either the dictation or the subsequent reading can be regarded as a publication by the corporation." (Italics ours.)

This New York case was decided in 1898. The court seemed to be impressed by the theory that if the stenographer had been the employee of the manager there would be a different situation; but when the manager and the stenographer are co-employees of a corporation the stenographer is a machine. However the doctrine in this case of Owen v. J. S. Ogilvie Pub. Co. (NY) supra, appears to be repudiated by the Court of Appeals in New York in Kennedy v. James Butler, Inc. 245 NY 204, 156

NE 666 (coming before it on certified questions) where the court refers to this case of Owen v. J. S. Ogilvie Pub. Co. and whittles it away showing it did not come to the Court of Appeals and "apparently is in conflict with" several cases cited. It says further, "Whether this court would uphold the ruling in the J. S. Ogilvie Pub. Co. Case or follow these other decisions we are not called upon to determine, as the point is not here." "These other decisions" are the cases of Pullman v. Walter Hill & Co. (British); Gambrill v. Schooley, 93 Md 48, 48 A 730, 52 LRA 87, 86 Am St Rep 414, supra; Ferdon v. Dickens, 161 Ala 181, 49 So 888, infra; Nelson v. Whitten (DC) 272 F 135, supra.

The alleged publication in the Kennedy Case consisted in this —the corporation through its manager wrote an alleged libelous letter and sent it to the managers of its branch retail stores in the City of New York on corporation business. The opinion states this to be the question, "Was the sending of this circular to the managers of the defendant's various retail stores throughout the City of New York a publication of the libel?" It holds it was a publication.

It will be noted that Judge Cardozo, in Ostrowe v. Lee, 256 NY 36, 175 NE 505, supra, cites this Kennedy Case with apparent approval though largely upon the question of privilege, but also on the question of publication. Clearly this J. S. Ogilvie Pub. Co. Case has been repudiated by New York even though South Carolina in Rodgers v. Wise, 193 SC 5, 7 SE2d 517, cites it as authority, but not in a case where the defendant is a corporation.

In determining who is a third person in a matter of publication of a libel, the Ohio Court of Appeals in Ohio Pub. Serv. Co. v. Myers, 54 Ohio App 40, 6 NE2d 29, 32, where the corporation was charged with libel, seems to brush aside all such distinction between third persons so far as coemployees are concerned, and to hold that a third person is a third individual. There is a personality there. The initiation of the wrong began with a letter to its general manager, and the sending of stenographic copies to its branch managers, and later the oral statements of the manager at a public gathering as to the con-

tents of the letter. The development of the nugatory theory based on acts of coemployees is influenced largely by the conception of the term privilege rather than the term publication; but when publication only is considered little difference, if any, is made. As an illustration Alabama decided Berry v. City of New York L. Ins. Co. 210 Ala 369, 98 So 291, supra, in 1923. In 1909 it had decided Ferdon v. Dickens, 161 Ala 181, 49 So 888, and there held: "The dictation of a libelous letter to a stenographer, who copies it from his notes on a typewriting machine, and the subsequent signing thereof by the person dictating, is a publication of the contents of the letter sufficient to support libel or slander, *although there is no communication of its contents to any other person.*" (Italics ours.)

In that case the writer represented a copartnership; as manager he dictated a letter to the copartnership stenographer and sent the letter to the copartnership agent. In Berry v. City of New York L. Ins. Co. (Ala) supra, the court cites this Ferdon Case and makes no distinction between the manager of a partnership dictating to the stenographer and sending the letter to the agent and the manager of a corporation dictating to the stenographer of a corporation. The acts in both cases are held to be publication.

To hold that a stenographer is not an individual but a mere cog in the machine because of modern development necessitated by the changes in business methods is a derogation of human personality, and not in harmony with the modern conception of the dignity of labor. As stated in Gambrill v. Schooley, 93 Md 48, 48 A 730, 52 LRA 87, 86 Am St Rep 414, supra, "Neither the prevalence of any business customs or methods, nor the pressure of business which compels resort to stenographic assistance, can make that legal which is illegal, nor make that innocent which would otherwise be actionable."

A man's personal right to be free from defamation of character as specified in § 14–0201, Rev Code, is surely not dependent upon the supposed cold necessities of business, so that to sacrifice rights of individual to supposed business necessity becomes controlling in the determining of human relations. The per-

sonal rights of the individual to be free from defamation of character are paramount to any exigencies of business and the stenographer who types and the office-boy who copies are individuals with personalities even if mere employees, whether the relationship of master and servant exists or whether all parties concerned are employees of an employer common to each.

In Locke v. Gibbons, 164 Misc 877, 299 NYS 188, it is said: "Courts can not legislate to eradicate long-established distinction between libel and slander;" and then distinguishes the terms by stating, " 'Libel' is written and 'slander' spoken defamation." Why should the courts now legislate with reference to stenographers and reduce them from persons to machines because of the exigencies of business?

The question of privilege with reference to the position of the stenographer seems to be inextricably mixed in the thinking of the courts so as to reduce her status.

However, if one were looking for the "modern trend" with reference to "the third person" the Restatement of the Law of Torts may be held to show the well-defined rules governing such a matter. In § 577 we find: "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." This is followed by these "comments" a, b, e, f, h.

"(a) A publication of the defamatory matter is essential to liability. (b) To constitute a publication it is necessary that the defamatory matter be communicated to some one other than the person defamed; (e) The fact that the defamatory matter is communicated *to an agent of the defamer* (italics ours) does not prevent it from being a publication sufficient to constitute actionable defamation. (f) One is libel for the publication of defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter. (h) The dictation of a defamatory letter to a stenographer who takes shorthand notes thereon is itself a publication of a libel by the person dictating the letter even though the notes are never transcribed nor read by the stenographer or any other person. As to the conditions under which such a dictation is

privileged see § 604." This § 604 deals with defensive matter.

We cannot approve the theory regarding a stenographer stated in the Tennessee case supra and other cases. We hold that the dictating of this letter by the manager to the stenographer and her transcription of her notes into the written instrument constitutes publication within the purview of the law of libel, whether the relationship be that of master and servant or of coemployees of a corporation.

The next proposition involves the question of privilege. Privilege is a matter of defense. McCurdy v. Hughes, 61 ND 235, 252, 237 NW 748, 754; 33 Am Jur 230, Libel and Slander. A defamatory writing, which on its face is libelous per se, is presumed to be unprivileged and therefore when the plaintiff proved the publication of this libel he made out a cause of action showing an unprivileged publication. "Privilege presupposes publicity. The plea of privilege is unnecessary if there has been no publication." Kennedy v. James Butler, Inc. 245 NY 204, 156 NE 666, 667.

As to whether defamatory matter is privileged, depends upon the statute. Section 14–0205 specifies when such communication is privileged, and the only subdivision which affects the case at issue is subdivision 3, as follows:

"In a communication, without malice, to a person interested therein by one who also is interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information, . . . ."

The only parts of this section which interest us are the terms "without malice" and "to a person interested therein, or by one who is also interested." As we have shown, defamatory matter, which on the face is libelous per se, presumes malice and therefore the lack of malice is a matter of defense.

The other portion of this subdivision "to a person interested therein by one who is also interested . . . ," is not applicable for though the defendants were interested yet the stenographer was not one of those who were interested so that such

a communication could be made to her and thus be considered privileged.

In the case of Pullman v. Walter Hill & Co. [1891] 1 QB (Eng) 524—CA, supra, the question was raised by the defendants that the stenographer was one who had an interest in the publication so as to make it privileged. Lord Esher, M.R., states the case thus: "Can the communication of the libel by the defendants in the present case to the type-writer be brought within the rule of privilege as against the plaintiffs—the persons libeled? What interest had the type-writer in hearing or seeing the communication? Clearly, she had none."

In the same case Lopes, Ld. J., states, "What interest had the defendants in making the communication to the type-writer, and what interest had the type-writer in receiving it? Clearly the defendants had neither duty nor interest, nor had the type-writer any interest." It is in connection with this quotation from Lopes, Ld. J., the federal court made the comment quoted in Nelson v. Whitten, supra. In the same case the third judge, Kay, Ld. J., states, "The composer of the letter dictated it to a type-writer, and handed it to a boy to copy. I can not conceive that there was any privilege between the managing director and the type-writer or the boy." He then comments on the exigencies of business and makes this very significant statement, "I have never heard of any authority for such a proposition. The consequence of such an alteration in the law of libel would be this—that any merchant or any solicitor who desired to write a libel concerning any person would be privileged to communicate the libel to any agent he pleased, if it was in the ordinary course of his business. That would be an extraordinary alteration of the law, and it would enable people to defame others to an alarming extent."

The right of free expression of fact or thought has its correlative in duty to the one who is the subject of such expression and to responsibility for damage occasioned thereby.

Did plaintiff prove damages, so that the jury had the question before it? "Every person, subject to the qualifications and restrictions provided by law, has the right of protection from

. . . . defamation . . . . ." Section 14–0201, Rev Code. "And defamation may be effected by libel or slander." Section 14–0202. To defame a person is to speak evil of him maliciously. And where words produce any perceptible injury to the reputation of another they are termed defamatory. Hollenbeck v. Hall, 103 Iowa 214, 72 NW 518, 519, 39 LRA 734, 64 Am St Rep 175. Plaintiff offered no testimony showing the amount of any special loss or damage which he sustained, even though he alleged he "had been deprived of gains and profits." Hence if the case had been submitted to the jury that body could not have allowed him damages for this item; but this does not mean the jury had nothing before it from which it could allow some damages.

To maintain his action all that was necessary for the plaintiff to do was to show unprivileged publication of this letter. He would then be entitled to nominal damages at least, the amount to be determined by the jury. That the statements made in the letter are true; or are misinterpreted; or are privileged; or there was no malice, or any other proof in mitigation of damages is a matter of defense. See McCurdy v. Hughes, 61 ND 235, 237 NW 748, supra.

Where actual damages are presumed, and where a party is guilty of the breach of an obligation not arising from contract, and in this breach has been guilty of malice actual or presumed, "the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant." Section 32–0307, Rev Code. This case should have been submitted to the jury. See Bedtkey v. Bedtkey, 15 SD 310, 89 NW 479.

Appellant complains of the court because of rulings in the offering of evidence whereby he was prevented from showing mental suffering. There was no error shown here as no damages for mental suffering were pleaded or demanded.

The question is raised by the defendants that in any event, even if defendant Tverberg is shown to be liable, yet the defendant corporation could not be charged with the publication. The answer sets forth Article X of the by-laws of the corpora-

tion: "This corporation shall have no capital stock, and is not organized for profit but for charitable purposes; no dividends shall ever be declared or paid to any of its members; all income from patients and all donations and dues shall be used for the maintenance and improvements of the hospital and the care of the needy."

The defendant Tverberg, when writing this letter involved, was acting in the scope of his employment as secretary of the defendant corporation and was engaged in business for the corporation; he was attempting to collect a bill due the corporation.

The general rule with reference to this feature is considered and set out in the great series of volumes of jurisprudence familiar to the courts. In 52 Am Jur 440, Statutes, this rule is stated, "It is a conceded general rule that all persons or entities are liable for torts committed by them, or by their agents while acting within the scope of their duties."

With reference to hospitals the authority—14 CJS 551,—deals with the divergence of opinion as to the liability of a charitable hospital for the torts or negligence of its agents or employees. The generally accepted rule is, "A corporation aggregate may be liable in a civil action for damages for the publication of an actionable libel by its agents or servants in the course of their employment, to the extent to which an individual personally making such publication would be liable, even though the libel was published without the corporation's knowledge or approval, or its special authorization; and the liability of the corporation and the agent is joint." This rule as stated in 19 CJS 957, is well supported.

In addition to the citations with reference to corporations in general we find in 41 CJS 342, the rule stated that, "A private hospital,—which is not exempted from liability as a charity . . . , may be held liable for injuries proximately caused by its own negligence, or for the negligence or misconduct of its officers' or employees occurring within the scope of their employment, . . . ."

In Washington Gaslight Co. v. Lansden, 172 US 534, 543, 43

L ed 543, 547, 19 S Ct 296, it is stated, "That a corporation may be held responsible in an action for the publication of a libel is no longer open for discussion in this court." The United States Supreme Court therein lays down this test, "the act in question must be performed in the course and within the scope of the agent's employment in the business of the principal."

In W. T. Grant Co. v. Owens, 149 Va 906, 141 SE 860, it is held: "Corporations may be sued and held liable for almost all classes of torts committed by their agents, including libel and slander, even where motive and intention are essential elements of liability." The court states also, "It is therefore almost universally held in cases of wrongs to the person, as distinguished from personal injuries arising from the agent's negligence, that the ordinary doctrines of agency apply to corporations to this extent: they are responsible for such wrongs committed by an agent, if the wrong was done while the agent was engaged in the ordinary course of his employment and grew out of an act connected with the employment. In such a case the person who has suffered injury may recover compensatory damages from the corporation as principal, and may recover punitive damages if the principal had authorized the tort, or has subsequently ratified it."

This court states, in the same case, that since, " 'corporations have become the great motive power of society, governing and regulating its chief business affairs,' filling practically every department of business and of human industry, and supplanting individual action in every direction, the old and doubtful doctrine as to the liability of corporations for torts committed by their agents has been forced to give way, even in those cases where motive and intention is an essential element of liability."

Title 10 of the Rev Code deals with corporations, and § 10–0101 provides: "The provisions of this title shall apply to all corporations other than public corporations unless, *from the context of any statute,* a different intention plainly appears." (Italics ours.) This title provides (§ 10–0107) that, "Every corporation, as such, has power, . . . to sue and be sued in

any court; . . . ." Chapter 10–08 of the title refers to benevolent corporations, not organized for profit, and nowhere therein do we find any exemption from liability for torts of agents. Law reports are full of cases where judgments are entered against hospitals for torts of employees. In the absence of statutory exemption, a non-profit corporation is liable for its torts the same as any other corporation. "A hospital, whether private or charitable, is liable to a patient for the torts of its employees under the doctrine of 'respondeat superior.'" St. Paul-Mercury Indem. Co. v. St. Joseph's Hospital, 212 Minn 558, 4 NW2d 637. Thus there is no exemption from liability merely because the hospital is a private institution or a charitable institution.

In the pleadings and the briefs the defendant corporation is described as "a charitable, non-stock, non-profit membership corporation." And the defendants urge this in defense of the hospital.

In the case at bar the corporation-by-law set forth in this answer is no defense. It is a rule of guidance for the corporation and may throw light on the type, but cannot be used as a ground of immunity.

The courts are not in accord with reference to the liability of certain charitable hospitals, particularly those created and maintained by trusts. In Hamilton v. Corvallis General Hospital Asso. 146 Or 168, 30 P2d 9, the court goes extensively into the bases for immunity for charitable hospitals and shows that there are three premises underlying the arguments—"the doctrine of implied waiver; the trust fund theory; and that of public policy." In Greatrex v. Evangelical Deaconess Hospital, 261 Mich 327, 246 NW 137, 86 ALR 487, immunity of charitable hospitals was declared because of trust situation where hospital authorities exercised reasonable care of selection of employees and because of the waiver theory.

There is nothing in the briefs or in the pleadings to show that the defendant hospital is one created by a trust fund. The point is before us however because the trial court made a separate ruling dismissing the case as to the hospital, and the case

involves its liability as distinct from the liability of the co-defendant.

As we have pointed out there is no statutory immunity in this state. To·release any corporation of the type involved from immunity for torts requires judicial legislation. In Sheehan v. North Country Community Hospital, 273 NY 163, 7 NE2d 28, 109 ALR 1197, the court stated it "is squarely presented for the first time in this court the question whether a charitable institution (not itself in default in the performance of any non-delegable duty) should be declared exempt from liability to a beneficiary for personal harm caused by the negligence of one acting as its mere servant or employee."

In the New York case the driver of the hospital ambulance, while conveying the patient to the hospital, came negligently into collision with another vehicle so that the patient was injured. In considering liability the Court of Appeals stated,

"The case for immunity must rest upon the hypothesis that a recipient of the benefit impliedly waives any claim for damages resulting from torts in the administration of a charity, *a theory that would be inapplicable were the plaintiff a stranger* to this hospital." (Italics ours.)

The court repudiated the immunity theory that is based upon the principle that by seeking the aid of the hospital the patient had "waived" any claims for liability.

If the theory of immunity is to be repudiated for a patient it is clear, from the decision, the court would not permit immunity as against a stranger to the work of the hospital.

Whatever may be the diversity of opinion with reference to the liability of a charitable hospital on the grounds of public policy, diversion of trust funds, or waiver, it will be noted that in practically all the cases where this immunity is allowed some patient was involved. In harmony with the Sheehan Case (NY) supra, the supreme court of Virginia as far back as 1914 discriminated between injuries to a patient and injuries to a stranger. In Hospital of St. Vincent v. Thompson, 116 Va 101, 81 SE 13, 51 LRA(NS) 1025, while declaring that, "A beneficiary of a charity cannot hold the association liable for negligent

injuries"—because of accepting the benefits of the charity, the court holds that a stranger who was injured by the charitable institution, "could recover, since she was not a beneficiary of the charity, but a stranger; a charitable institution not being exempt from torts against strangers because it holds its property in trust to be applied to the purposes of charity." The negligence consisted in leaving an elevator shaft unprotected.

To hold that one who was not a patient, but a mere debtor of the corporation, could be libelled and the corporation escape liability for tort because of the judicial theories of waiver, public policy or trust funds would be placing such institutions in a field in which only the State may enter.

In Welch v. Frisbie Memorial Hospital, 90 NH 337, 9 A2d 761, the court discusses the theory of immunity, stating the "waiver theory has no substantial basis in fact . . . and does not commend itself to us as a basis of decision." Again the court states, ". . . the trust fund theory was examined at length and discarded as unsound."

"If the trust fund theory tends to encourage philanthropically minded people to establish charitable institutions, and if it could be demonstrated that the imposition of tort liability tends to discourage such undertakings, a matter which now lies wholly in the realm of speculation, '. . . no conception of justice demands that an exception to the rule of respondeat superior be made in favor of the resources of a charity and against the person of a beneficiary injured by the tort of a mere servant or employee functioning in that character.' "

The court cites this New York case of Sheehan v. North Country Community Hospital, 273 NY 163, 7 NE2d 28, 109 ALR 1197, supra, where the court stated, "A charitable institution is not exempted from the rule of respondeat superior in the event of injury to a beneficiary occasioned by the negligence of its servant or employee." Regarding the doctrine of public policy the court states, "A hospital cannot be relieved of liability for negligence of its servants upon a theory of public policy in the absence of legislative announcement of such public policy." The court further sets forth, "although judicial power undoubtedly

exists 'to declare public policy unsupported by legislative announcement of it . . . the policy must be based on a thoroughly developed, definite, persistent and united state of the public mind.' . . . There must be no substantial doubt about it."

The theory of public policy favoring charitable institutions is not tenable unless the public policy is announced by the legislature. See also 10 Am Jur 689, Charities.

Though the rule is that a corporation is liable for the wrongful acts committed by the agent in the course of and in connection with his duties or employment, this does not carry with it necessarily the assessment of exemplary damages against the master even though recoverable against the servant.

We realize there is conflict of authority on this question. Minnesota holds that where the servant in the course of his employment, with a view to the furtherance of his master's business, and not for a purpose personal to himself, commits a tort within the course of his employment, and the acts of the servant are such as to warrant exemplary damages against him, "Such damages may be recovered from the master, even though he did not participate in, authorize or ratify his servant's acts, if done in the course of the performance of the duties of his employment and within the scope thereof." Schmidt v. Minor, 150 Minn 236, 184 NW 964. However in this jurisdiction it is the rule that punitive damages are not recoverable against the employer, unless he participated in the wrongful act of the employee, or approved thereof either before or after its commission. Voves v. Great Northern R. Co. 26 ND 110, 143 NW 760, 48 LRA(NS) 30. In this case cited we noted the corporation was "a public service corporation, a common carrier," but the nature of the corporation affords no reason for exemption from punitive damages. We assume that the employer, in selecting the employee contemplates proper action in the course of employment. Within "scope of the employment" does not contemplate criminal acts done to further the work sought to be done. We see no reason for extending the term to include acts for which punishment in the way of punitive damages may be inflicted. In the

case cited we considered carefully the principles underlying the assessment of punitive damages and held that the master is not liable for these unless there was authorization of the alleged acts justifying assessment against the employee or a ratification thereof. In this respect the general rule with reference to assessment of punitive damages applies where the master is a corporation the same as when an individual. We adhere to the rule laid down in the Voves Case that the mere relation of master and servant does not in itself impose liability for exemplary or punitive damages; but that authorization or ratification must be shown.

The plaintiff established a cause of action against both defendants and had a right to a determination by the jury. The judgment of the lower court is reversed and a new trial is ordered.

CHRISTIANSON, Ch. J., and MORRIS and BURKE, JJ., concur.

NUESSLE, J. (dissenting). I am unable to agree with much that is said in the foregoing opinion and particularly with those portions of the opinion on which paragraphs four, five and seven of the syllabus are predicated. With respect to paragraphs four and five, I call attention to the cases of Freeman v. Dayton Scale Co. 159 Tenn 413, 19 SW2d 255; Prins v. Holland-North America Mortg. Co. 107 Wash 206, 181 P 680, 5 ALR 451, and Globe Furniture Co. v. Wright, 49 App DC 315, 265 F 873, 18 ALR 772, and cases cited in their respective notes. And with respect to paragraph seven I call attention to 14 CJS pp 550 et seq.