No. 39,185

WILLIAM B. NOEL, by his wife and next friend, MRS. W. B. NOEL, *Appellant,* v. THE MENNINGER FOUNDATION, a corporation, *Appellee.*

(267 P. 2d 934)

Opinion filed March 6, 1954.

*T. M. Lillard,* of Topeka, argued the cause, and *O. B. Eidson, Philip H. Lewis, James W. Porter,* and *Charles S. Fisher, Jr.,* all of Topeka, were with him on the briefs for the appellant.

*Ralph W. Oman,* of Topeka, argued the cause, and *James A. McClure, Robert L. Webb, Philip E. Buzick, Robert A. McClure,* and *James D. Waugh,* all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WERTZ, J.: This is an appeal from an order of the trial court sustaining a demurrer of the defendant, The Menninger Foundation (appellee), to the amended petition of plaintiff, William B. Noel (appellant), in a suit brought to recover damages for personal injuries alleged to have been caused by the defendant's negligence.

The plaintiff, William B. Noel, a man seventy-one years of age and a mental patient of the Menninger hospital in Topeka at the time the cause of action arose, sued jointly The Menninger Founda-

tion and its co-defendant, Albert E. McCaig, for severe personal injuries sustained by the plaintiff when he was struck by a truck as he walked across West Sixth Street in Topeka in front of the Menninger hospital to go to the hospital office on the north side of the street.

The injuries to plaintiff were alleged to have been sustained through the joint negligence of Menninger, whose nurse or attendant in charge of plaintiff, had negligently permitted him to go upon the busy highway when his mental condition was such that he was unable to understand the dangers of so doing, and the negligence of the driver of the McCaig truck in carelessly striking the plaintiff with the truck driven at high speed and without keeping a proper lookout.

Defendant McCaig's demurrer to the amended petition in this action was overruled by the trial court, and this ruling of the trial court was sustained by this court on appeal. (*Noel v. McCaig,* 174 Kan. 677, 258 P. 2d 234.) The allegations of the petition are well stated in the mentioned case and need not again be repeated in detail here, except that it was subsequently inserted in the amended petition that the Menninger Foundation was incorporated as a non-profit organization. Supplementing these facts, it may be stated that paragraphs 8, 9 and 10 of the amended petition clearly set out the facts, circumstances and conditions which establish a relationship between the patient and the hospital. In these paragraphs it was alleged that the plaintiff, a patient of the type indicated, while standing at the very edge of this dangerous highway, told the attendant charged with the duty to care for and restrain him that he wanted to go across the highway to the other side where the hospital doctors were located. Being apprised of this desire on the part of the plaintiff, the attendant should have been alert to restrain the plaintiff from going on the highway. Expression of such a desire by such a patient is adequate warning that, unless restrained, there will be an attempt to carry out the desire. These allegations of the petition follow:

"The highway where the plaintiff and his attendant stood is known as West Sixth Street in the City of Topeka, and is on the route of Kansas State Highway No. 4, and U. S. Highway No. 40, and is a heavily traveled highway continuously used by fast moving traffic.

"11. In view of plaintiff's mental infirmities, which were well known to the defendant, The Menninger Foundation, the act of said defendant's agent, servant and employee in taking plaintiff to said place designated for the use of pedestrians in crossing the busy highway, and the further conduct of the said defendant's agent, servant and employee in failing to restrain the plaintiff

after he had expressed a desire to cross the highway, were negligent acts and omissions of duty. Thereupon, the plaintiff, who was by reason of his mental infirmities (as was well known, or in the exercise of reasonable care and caution should have been well known to the defendant, The Menninger Foundation, and to its said agent, servant and employee) unable to understand and appreciate the fact that this was a heavily traveled highway where he would encounter the hazards and dangers of being struck by an automobile or truck, attempted to cross the highway at that point.

"12. After he started to cross the street, and as the plaintiff reached the traveled portion of the highway, he was struck and knocked to the ground by an eastbound truck of the defendant, McCaig Plumbing Company, which was being driven or operated by an agent, servant and employee of said plumbing company in and about the business of said company. The defendant plumbing company's truck was negligently operated in the following respects: . . .

"13. As a result of being struck by the truck as above alleged, the plaintiff, who is a man 71 years of age, suffered a severe multiple fracture of the left femur (thigh bone), which required, after the setting of the fracture, additional surgery. . . .

"14. Plaintiff's said injuries were directly and proximately caused by the negligence of the defendant, The Menninger Foundation, as hereinbefore alleged, operating jointly and concurrently with the negligence of the defendant, Albert E. McCaig, d/b/a McCaig Plumbing Company, as hereinbefore alleged."

Paragraph 16 of the amended petition itemized the damages sustained, and the prayer was for damages. The defendant demurred to this amended petition on the ground that it did not state facts sufficient to constitute a cause of action in favor of the plaintiff and against the defendant, and for the further reason the petition disclosed that The Menninger Foundation is a charitable organization providing diagnosis, care and treatment of patients including those whose funds are inadequate. The court sustained the demurrer generally, and it is from that ruling that plaintiff appeals.

Plaintiff first contends that the trial court erred in sustaining the demurrer to his amended petition, on the ground that it failed to state a cause of action against defendant for negligence. Defendant argues that the petition shows no negligence on its part, which was the proximate cause of any of the injuries sustained by plaintiff. The gist of defendant's argument is based upon the premise that the petition charged only that Menninger failed to restrain the plaintiff under circumstances which were not patently present nor sufficiently apparent to impose upon the defendant the necessity of restraint upon plaintiff just at and prior to the time he started across the street, and that at most the only thing that defendant did was to create a situation which supplied or created a condition, and that

the proximate cause of the injury was the negligence of the driver of the McCaig Plumbing Company truck. We will not labor this point. A reading of the petition will disclose acts of negligence on the part of the defendant. Our decisions as well as other authorities recognize that two or more events may combine to produce a result and both be a proximate cause. It has been held that where injury to an innocent person would not have occurred except for the concurrent negligence of others, the subject of proximate cause need not be considered, and those whose acts united in producing the injury will be jointly and severally liable to the injured party. (*Rowell v. City of Wichita*, 162 Kan. 294, 176 P. 2d 590; *Taggart v. Yellow Cab Co. of Wichita*, 156 Kan. 88, 131 P. 2d 924; *Gibson v. Bodley*, 156 Kan. 338, 133 P. 2d 112.) In *Rowell v. City of Wichita*, supra, we stated:

"While it has been held that if two distinct causes are successive and unrelated in operation, they cannot be concurrent (*Railroad Co. v. Justice*, 80 Kan. 10, 101 Pac. 469; and *Thummel v. State Highway Comm.*, supra), the rule that the causal connection between an actor's negligence and an injury is broken by the intervention of a new, independent and efficient intervening cause, so that the actor is without liability, is subject to the qualification that if the intervening cause was foreseen or might reasonably have been foreseen by the first actor, his negligence may be considered the proximate cause, notwithstanding the intervening cause. (*Clark v. Powder Co.*, 94 Kan. 268, 146 Pac. 320, L. R. A. 1915 E. 479, Ann. Cas. 1917 B 340; *Fraser v. Railway Co.*, supra.) It has also been held that one who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third person may have contributed to the final result. See *Crow v. Colson*, 123 Kan. 702, 256 Pac. 971, 53 A. L. R. 457, where it was said:

'Where defendant knows or has reasonable means of knowing that consequences not usually resulting from the act are likely to intervene so as to occasion damage, he is liable although it be not an ordinary and natural consequence of the negligence.' (Citing cases.) (l. c. 704.)"

The mentioned rules of law were again discussed and analyzed in the case of *Reed v. Mai*, 171 Kan. 169, 175, 231 P. 2d 227. It follows that plaintiff's amended petition states facts sufficient to constitute a cause of action against defendant unless the immunity doctrine, hereinafter discussed, applies.

This brings us to the second and important question: Where a patient of a hospital, operating as a nonprofit organization, sustains injuries by reason of the negligence of a nurse or attendant, may such patient recover damages from the hospital? Or, stated in another way: Under the social conditions and tendencies now

prevailing throughout the United States, should a hospital, because it operates under a charter as a nonprofit organization, be held exempt from liability for injuries caused by its negligence?

The trial court, feeling that it was bound by our earlier decisions to hold that charitable and nonprofit organizations were immune from tort liability, sustained defendant's demurrer to plaintiff's petition.

The doctrine of immunity of charitable corporations found its way into the law in this country through the dictum of Lord Cottenham in *The Feoffees of Heriot's Hospital v. Ross*, 1846, 12 Clark & Fin. 507, 513, 8 Eng. Reprint 1508: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose." The action was for damages for wrongful exclusion from the benefits of the charity, not for personal injury inflicted in its operation. Previously, in *Duncan v. Findlater*, 1839, 6 Clark & Fin. 894, 7 Eng. Reprint 934, the same judge had utttered a similar dictum, and this was followed in *Holliday v. St. Leonard*, 1861, 11 C. B., N. S., 192. However, the dictum of *Duncan v. Findlater* was overruled by *Mersey Docks Trustees v. Gibbs*, [1866] L. R. 1 H. L. 93, and the ruling of *Holliday v. St. Leonard* was reversed by *Foreman v. Mayor of Canterbury*, [1871] L. R. 6 Q. B. 214.

In this state of the English decisions, Massachusetts adopted the repudiated rule of *Holliday v. St. Leonard* in *McDonald v. Massachusetts General Hospital*, 1876, 120 Mass. 432, 21 Am. Rep. 529, and Maryland followed Heriot's case in *Perry v. House of Refuge*, 1885, 63 Md. 20, 52 Am. Rep. 495. Apparently both courts acted in ignorance of the English reversal. In any event, they resurrected in America a rule already dead in England, and thereby gave Lord Cottenham's dictum a new lease on life in the New World. For a further discussion of the historical background of the immunity rule, see *President and Dir. of Georgetown College v. Hughes*, 76 U. S. App. D. C. 123, 130 Fed. 2d 810, and editor's comments in 25 A. L. R. 2d 38.

This court's attention was first called to the immunity doctrine in the year 1916, in the case of *Nicholson v. Hospital Association*, 97 Kan. 480, 155 Pac. 920, where we held that charitable associations conducting a hospital were not liable for the negligence of their physicians and attendants resulting in injury to patients unless it was shown that the association maintaining the hospital had not

exercised reasonable care in the employment of its physicians in attendance.

Subsequently, in *Davin v. Benevolent Association,* 103 Kan. 48, 172 Pac. 1002, we held that a charitable hospital corporation was not liable in damages for the failure of its medical superintendent to comply with a contract made by him for the care of a patient being treated in the hospital, and gave as the reason for the rule that trust funds created for benevolent purposes should not be diverted therefrom to pay damages arising from the torts of servants, and that public policy encourages the maintenance and support of institutions and protects them from the maw of litigation.

Later, in the year 1929, in *Webb v. Vought,* 127 Kan. 799, 275 Pac. 170, we held the Salvation Army, a religious, charitable and philanthropic association, was not liable in damages for the injuries sustained by a third person in a collision with a motor truck negligently driven by an employee of the Salvation Army. This appears to be the first of our cases which definitely placed immunity upon charitable organizations for negligence of their employees, apparently without regard to whether they had been carefully selected. In the majority opinion in this case, it was stated that the liability of charitable organizations for injuries caused by the negligence of agents or employees, working in or for such organizations, has often been presented to the courts of this country, and concluded the statement by saying "the decisions are in hopeless confusion and irreconcilable conflict." Mr. Justice Marshall dissented in this case and stated that all persons, organizations and corporations stand on an equality before the law; all should be bound alike and excused alike; if one is liable for the negligent act of his agent or employee, all should be liable. Mr. Justice Harvey, our present Chief Justice, also dissented.

Later, in *Ratliffe v. Wesley Hospital,* 135 Kan. 306, 10 P. 2d 859, the broad doctrine of the Webb case was followed, although the court in its opinion had occasion to say "in this case the surgeon and the nurse were of the appellant's own choosing."

We last dealt with this question in the year 1944, where we said in *Leeper v. Salvation Army,* 158 Kan. 396, 147 P. 2d 702, that the resources of a charitable organization, whether acquired by gift of money, or donated articles converted into money or trust funds, cannot be subjected to the payment of damages for the negligent acts of its corporate agents.

Plaintiff asks us to review our former decisions and reconsider them in the light of social conditions and tendencies, now prevailing in our country, and place such institutions on the same basis as individuals and other corporations, and to overrule our former decisions and withdraw from charitable and nonprofit institutions the cloak of immunity which now protects them from liability for their torts.

The question is one of great interest, and much has been written about it in recent years. It is one about which there has been great conflict and diversity of opinion among the various courts of our country in reaching the ultimate conclusion as to the correct reason or ground for so deciding. When we look to earlier decisions from other jurisdictions for enlightenment, we are confronted with an irreconcilable conflict of reasoning and result.

At the outset of the "immunity from tort" theory, the need for charity in the way of treatment of the suffering was urgent, and the general good of society demanded encouragement. Early in our history, hospitals, being the particular charity which we have before us, were relatively few in number, and were created and conducted solely by funds donated by public-spirited people, and were generally small institutions, many connected with churches and of limited means. Their doors were open to all alike, irrespective of ability to pay. There was little, if any, paternal care created by the state. The granting of immunity from liability for negligence of employees may have been a basis for encouraging such charity.

The hardships and burdens of charitable organizations of the past have, to a large extent, ceased to exist. These institutions of today have, in many instances, grown into enormous businesses, handling large funds, managing and owning vast properties, much of it tax-free by statute, set up by large trusts or foundations, enjoying endowments and resources beyond anything thought of when the matter of immunity was first considered. They have a capacity for absorbing loss which did not exist even a few decades ago. While not operated as dividend-paying corporations, much of their revenue, as in the present case, came from paying patients. It may also be stated that if there is any danger of dissipation of funds through payment for injury inflicted, insurance against such liability is now available to guard against it, and prudent management will provide the protection.

Other courts have been asked to reconsider their former decisions applying the immunity doctrine, and have written very exhaustive

and able opinions holding, under the trend of modern times, that the rule is unsound. The almost unanimous view expressed in the recent decisions of our sister states is that insofar as the rule of immunity was ever justified because of the need of financial encouragement and protection, changed conditions have rendered the rule no longer necessary.

An exhaustive review of the immunity doctrine will be found in *President and Dir. of Georgetown College v. Hughes*, 76 U. S. App. D. C. 123, 130 F. 2d 810, wherein, among other things, it is stated at page 130:

"It is perhaps impossible, if it were worth while, to make an exact summary of the present state of American decision or to determine with accuracy what is the 'prevailing rule.' An effort to do this made later discloses a tangled skein from which it is difficult to draw a thread of dominant strength, even on a numerical basis. This much, however, is sure. The immunity, so far as it ever existed, has disappeared largely as to all persons and classes of claimants save one. This includes only so-called beneficiaries of the trust or charity. That class now is disintegrating, and the rights of the beneficiary, who needs the protection most, also are securing recognition. If we look at results, therefore, rather than words or forms of statement in opinions, for the test of what is 'the law' or 'the prevailing rule,' immunity is not 'the rule' and liability 'the exception.' The rule has become merely a relict in the multitude of departures."

And it was further held, page 140:

"The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications. It is disintegrating. Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction. As more and more steps are taken, correction becomes more complete. The process is nearing the end. This leaves the steps untaken standing out as the more anomalous."

In 25 A. L. R. 2d, beginning at page 29, is published a very elaborate annotation entitled, "immunity of nongovernmental charity from liability for damages in tort." This annotation is practically a complete textbook on the subject indicated in its heading. The author of the A. L. R. note in his editorial comment thus sums up the reasons for repudiating the immunity rule, and at page 42, states:

". . . recognized by the courts, opinion among scholars outside the courts almost uniformly supports the doctrine of liability as against that of immunity. It has been pointed out that a court, in ruling on the question of im-

munity as one of first impression, or in determining whether earlier cases granting immunity should be overruled, should be guided by the unanimous opinion of legal writers on the subject.

"Of the many persuasive reasons advanced in support of abandoning the immunity rule in toto, the decisive reasons seem to be that neither those who organize a charitable institution nor the courts have authority to put charities beyond the pale of the law applicable to all, and that protection of life and limb by organized society is of greater importance to mankind than any species of charity, and is superior to rights of property. . . .

"Fortunately, the trend of recent decisions is toward abandoning the immunity rule. Immunity has been denied in all recent decisions in which the court was unfettered by precedent. Even precedents have not prevented some courts from abandoning the immunity rule. Other courts, however reluctantly, have felt themselves to be bound by precedent under the rule of stare decisis, taking the view that it was for the legislature to repudiate their decisions, and that legislative inaction indicated.approval. As against this judicial attitude, it has been pointed out that the immunity rule was introduced by the courts without legislative sanction, and that it is, therefore, for the courts to undo what they have themselves brought about."

The supreme court of Iowa was very recently asked to overrule its immunity doctrine, and in *Haynes v. Presbyterian Hosp. Assn.*, 241 Iowa 1269, 45 N. W. 2d 151, said:

"Emphasis of law generally is on liability for tort rather than immunity from wrongdoing. (Headnote 3.)

"Legislature, not courts, creates and grants immunity from liability for wrongdoing. (Headnote 4.)

"Fact that court may have at an early date in response to what appeared good as a matter of policy created immunity from wrongdoing is not a sound reason for continuing rule when under all legal theories rule is basically unsound, especially when reasons upon which rule was built no longer exist." (Headnote 5.)

In a very recent opinion, the Arizona supreme court overruled its earlier decisions which had established the immunity rule in that state, and in *Ray v. Tucson Medical Center*, 72 Ariz. 22, 230 P. 2d 220, stated: '

"Public policy is fluctuating, varying with customs growing out of changing social, political and economic conditions. (Headnote 4.)

"The declaration of public policy is primarily a legislative function though courts have authority to declare a public policy which already exists and to base its decisions upon that ground, but in absence of a legislative declaration before courts are justified in declaring existence of public policy it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt. (Headnote 7.)

"When the reason for the existence of a declared public policy no longer obtains, court should without hesitation declare that such public policy no longer exists. (Headnote 8.)

"Charitable institutions are liable for torts of their servants from which injury proximately results to a third person, whether stranger or patient, and whether the patient is a paying or nonpaying patient." (Headnote 9.)

To the same effect, see *Mississippi Baptist Hosp. v. Holmes,* 214 Miss. 906, 55 So. 2d 142, 25 A. L. R. 2d 12.

In a case decided by the supreme court of Vermont in 1950, a decree overruling a demurrer to a count of the answers setting up defendant's immunity from liability as a privately conducted religious and charitable institution, which had exercised due care in the selection of its agents and servants, was reversed by that court in *Mary Foster v. Roman Catholic Diocese,* 116 Vt. 124, 70 A. 2d 230, 25 A. L. R. 2d 1, rejecting the various theories in support of the claimed immunity, and considered the case upon the broad question of liability and nonliability of a private charity, deciding against the claimed immunity, regardless of the question whether the injured person was a beneficiary of the benefits of the charity or a stranger thereto, and a portion of the opinion reads, at page 133:

"Non-liability can easily breed neglect. The public, as well as patients and others, are interested in having hospitals and in fact any private charity that is open to the public properly conducted, in having its buildings and facilities safe, and in having its agents and servants perform their duties carefully and without negligence. We cannot subscribe to that theory and therefore free such an institution, thereby giving it special consideration, from the negligence of its agents or servants and render it liable only for negligence in its selection of them. *Sheehan v. North Country Community Hospital,* 273 NY 163, 7 NE2d 28, 109 ALR 1197; *Basabo v. Salvation Army,* 35 RI 22, 85 A 120, 42 LRANS 1144; *Sessions v. Dee Memorial Hospital,* 94 Utah 460, 78 P2d 645."

In a line of cases extending from 1893 to 1943, the supreme court of Washington uniformly held that a charitable hospital was not, in the absence of showing of negligence in the selection or retention of its doctors or nurses, liable for the negligence of such employees in treating a patient. In a most recent, extensive opinion (1953), *Pierce v. Yakima Valley Memorial Hospital Ass'n,* —— Wash.——, 260 P. 2d 765, that court reconsidered its former opinions and concluded there was no factual justification for immunity and that principles of law, logic and intrinsic justice demanded that the mantle of immunity be withdrawn. The court rejected the assertion that it must wait for legislative action saying, "We closed our courtroom doors without legislative help, and we can likewise open them," and that it was not necessary that courts be slow to exercise a judicial function simply because they have been fast to exercise a legislative one.

For further authority on the questions presented, see *Tucker v. Mobile Infirmary Association*, 191 Ala. 572, 68 So. 4, L. R. A. 1915D 1167; *Silva v. Providence Hospital of Oakland*, 14 Cal. 2d 762, 97 P. 2d 798; *Nicholson v. Good Samaritan Hospital*, 145 Fla. 360, 199 So. 344; *Mulliner v. Evangelischer Diakonniessenverein*, 144 Minn. 392, 175 N. W. 699; *Borwege v. City of Owatonna*, 190 Minn. 394, 251 N. W. 915; *Welch v. Hospital*, 90 N. H. 337, 9 A. 2d 761; *Rickbeil v. Grafton Deaconess Hospital*, 74 N. D. 525, 23 N. W. 2d 247.

It is a general principle that for negligent or tortious conduct, liability is the rule. Immunity is the exception to the rule, created by the courts which have applied it. The law's emphasis is ordinarily on liability, not immunity for wrongdoing.

The immunity of charitable corporations for torts is based upon very dubious grounds. It would seem that a sound social policy ought, in fact, to require such organizations to make just compensation for harm legally caused by their activities, under the same circumstances as individuals before they carry on their charitable activities. All persons, organizations and corporations stand on an equality before the law. All should be bound alike or excused alike. If one is liable for a negligent act of his agent or employee, all should be liable. It would seem that the policy of the law would require individuals to be just before being generous, and the same rule should be applicable to charitable organizations. To require an injured individual to forego his cause of action for the wrongful acts of another when he is otherwise entitled thereto because the injury was committed by charity, is to require him to make an unreasonable contribution to charity against his will, and a rule of law imposing such burdens cannot be regarded as socially desirable nor consistent with sound policy. (Harper on Torts, p. 657, §294.)

It is somewhat surprising to note that in none of the decisions establishing the immunity doctrine in this state was the question ever presented or consideration given to the provisions of our constitution. Section 18 of our bill of rights reads: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." It is clear from plaintiff's petition that he has suffered injuries in person, and under our state constitution he shall have remedy by due course of law. (*Rowell v. City of Wichita*, 162 Kan. 294, 300, 176 P. 2d 590.) Neither our constitution nor our statute says anything about releasing charitable, educational or religious organizations

from liability for negligence which results in personal injuries to another. Section 18 of our bill of rights is to the contrary. Thus it would appear that the public policy of this state, as enumerated by its constitution, is to put justice "by due course of law" above or before charity. The constitution, article 11, section 1, and our statute, G. S. 1949, 79-201, do make provisions for releasing such institutions from taxation. Had it been the intent of the framers of our constitution to grant immunity to charitable organizations for their torts, provisions would have been made for such. The constitutional provision guaranteeing to every person a remedy by due course of law for injury done him in person or property means that for such wrongs that are recognized by the law of the land the court shall be open and afford a remedy, or that laws shall be enacted giving a certain remedy for all injuries or wrongs. "Remedy by due course of law," so used, means the reparation for injury ordered by a tribunal having jurisdiction in due course of procedure after a fair hearing. It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries. (11 Am. Jur. 1124, 1125, Constitutional Law, § 326.)

To exempt charitable and nonprofit corporations from liability for their torts is plainly contrary to our constitutional guaranties (Bill of Rights, § 18). It gives to certain favored ones, selected arbitrarily, immunity from that equal liability for civil wrongs which is a sign of equality between citizens. It undertakes to clothe charitable and nonprofit organizations with special privileges denied to other corporations, and society. It takes from individuals the right to assert in the courts claims against all who tortiously assail their person and property and to recover judgment for the injuries done. It prevents all persons from having recourse to law for vindication of rights or reparation for wrongs against the privileged charitable, nonprofit organization. It frees one set of corporations from obligations to which their competitors, and individuals, are subjected. In short, it destroys equality and creates special privilege. (*In re Opinion of The Justices,* 211 Mass. 618, 98 N. E. 337.)

For the foregoing reasons, we are of the opinion that if public policy ever required that charitable institutions should be immune from liability for the torts of their servants, that public policy no longer exists. We now hold that charitable institutions are liable for the torts of their servants from which injury proximately results

to a third person, whether stranger or patient, and whether the patient is a paying or nonpaying patient. Anything in our previous mentioned decisions holding to the contrary is hereby overruled. In view of our holding, other questions raised need not be discussed. The judgment of the trial court is reversed and the cause is remanded with instructions to overrule defendant's demurrer to plaintiff's petition as amended.

It is so ordered.