MISSISSIPPI BAPTIST HOSPITAL v. HOLMES, et al.

In Banc, Nov. 19, 1951

No. 38038 (55 So. (2d) 142)

On Suggestion of Error, Jan. 28, 1952, (56 So. (2d) 709)

Watkins & Eager, and Butler, Snow & O'Mara, for appellant.

908

Barnett, Jones & Montgomery, for appellees.

**McGehee, C. J.**

The widower and the children of Mrs. George R. Holmes brought this suit for damages and recovered a judgment in the sum of $25,000 against the Mississippi Baptist Hospital and one of its laboratory technicians on account of the death of the said Mrs. Holmes on June 18, 1949, which is alleged to have occurred as the proximate result of the negligent act of the technician done on the night of June 16, 1949, in mislabeling in her name the Type "2" blood intended for a Mrs. Holder (a patient in another room on the same floor of the hospital whose blood was typed as such by him on the same occasion) as being intended for use in connection with the blood transfusion to be given the next morning to Mrs. Holmes, whose blood had been correctly typed by this technician and found to be Type "4", and she was given a transfusion of about 700 c. c. of the Type "2" blood during a surgical operation on the next morning, approximately twenty-four hours prior to her death; and it was shown at the trial that as much as 500 c. c. or less of Type "2" blood given to a Type "4" patient is very dangerous and probably fatal unless the very grave condition that may be produced thereby can be

timely relieved by corrective means, the use of which proved of no avail in the instant case.

As heretofore stated, the judgment for damages was against both the technician and the hospital, but only the latter has prosecuted an appeal, the former being obviously negligent.

The precise issues raised by the pleadings and developed under proof are: (1) Whether or not the corporate defendant hospital was negligent either in failing to exercise reasonable care in the selection and employment of this laboratory technician or in retaining him in its employ under the facts and circumstances alleged to have been known to the hospital, or which should have been known by the exercise of reasonable care, prior to his having correctly typed and accurately cross-matched the blood of the two patients hereinbefore mentioned but which he negligently mislabeled as aforesaid; and (2) whether or not, while acting through this technician as its agent and employee, the hospital was negligent in permitting the samples of the blood of the deceased to become mixed and confused with that of another person, because of the mislabeling of the same, so as to result in the wrong type of blood being used and causing the death of this patient, thereby rendering the hospital liable in damages, notwithstanding that its managing officers and agents and its board of trustees may have exercised reasonable care in the selection, employment, and retention of the said employee in its service; and (3) assuming that there was no failure to exercise reasonable care in the selection, employment or retention of said employee, but that nevertheless the death of this patient was proximately caused by his negligent act while engaged in the duties and acting within the scope of his employment, then whether or not the hospital would be relieved of liability for his negligence on the ground that it is chartered and operated as a charitable institution which has never issued any stock, has paid no profit or dividends to any

of its incorporators or to its owner, the Mississippi State Baptist Convention, and has at all times devoted its entire income and revenues from every source to the payment of the expenses of its operation, including the compensation to its employees, the expansion of its facilities in the erection and maintenance of the buildings, and the furnishing of new equipment for carrying on its work of benevolence and charity in connection with its function as a general hospital, the charter of which provides that it may "charge and collect fees and compensation from all persons, and for all services rendered, and may do charitable work."

As to the issue first above stated, and on which issue alone, together with whether or not the technician was negligent and his negligent act was the proximate cause of the patient's death, the case was submitted to the jury, under the rule announced by our previous decisions in the cases of Eastman, Gardiner & Co. v. Permenter, 111 Miss. 813, 72 So. 234; James v. Yazoo & M. V. Railroad Co., 153 Miss. 776, 121 So. 819; Miss. Baptist Hospital v. Moore, 156 Miss. 676, 126 So. 465, 67 A. L. R. 1116; Pace v. Methodist Hospital, Miss., 130 So. 468; Rhodes v. Millsaps College, 179 Miss. 596, 176 So. 253; and International Order of Twelve of Knights and Daughters of Tabor of Mississippi v. Barnes, 204 Miss. 333, 37 So. (2d) 487, we have concluded, from a careful examination of the record of more than 1250 pages now before us, together with the briefs of approximately 440 pages filed by opposing counsel, there is no substantial evidence to show that either the chief pathologist and the director of the laboratory, Dr. Forrest G. Bratley, or that the superintendent of the hospital, Mrs. Karenza Gilfoy, or the members of the board of trustees were guilty of any failure to exercise reasonable care in the selection and employment of the technician in question, or that they were guilty of any negligence whatsoever in retaining him in the employ of the hospital during his period of service from September

13, 1948, until the negligent act complained of was committed; and that, therefore, it was error for the case to have been submitted to the jury on that issue.

It would unduly prolong this essentially lengthy opinion if we should do more than summarize the evidence on which we base the foregoing conclusion. We deem it sufficient to say that the applicant came highly recommended by the chief pathologist and director of the laboratory at the U. S. Veterans Administration Hospitals, both at Gulfport and Biloxi, Mississippi, under whom he had worked as a laboratory technician at these hospitals from July 6, 1946, to September 3, 1948, and also by the chief laboratory technician at the latter hospital where he had worked for all of said period except the first eleven months thereof; that he had previously served for a considerable time in the hospital corps of the U. S. Navy when he was taught by college professors and had satisfactorily completed several courses of preparatory training for his work as a laboratory technician; that according to the undisputed testimony of all the witnesses who testified on the subject, he proved his fitness and competency in such capacity as an employee of the appellant, Mississippi Baptist Hospital, from September 13, 1948, until the occasion of the negligent act herein complained of on September 16, 1949, even though it was shown that as a premedical student at college, during his spare time from night duty at the hospital, he failed on some of his studies, such as zoology, English composition, part of his organic chemistry, and European history, the lack of a thorough knowledge of which could not have reasonably caused him to mislabel the blood of Mrs. Holmes as being Type "2" after he had correctly typed the same as Type "4" blood. And the other circumstances relied upon by the plaintiffs as tending to show the technician's incompetence amounts to no more than a scintilla of evidence in that behalf as compared with his training, experience and proven ability as a competent man for the laboratory

work for which he was employed. In other words, the case presents the tragic consequence alleged to have proximately resulted from the very negligent act of one who had theretofore shown himself highly competent to do the work that he was employed to do.

The foregoing conclusion has rendered it necessary that we consider the second and third issues hereinbefore stated in paragraph three of this opinion and determine whether or not we shall adhere to the rule announced in some or all of the cases already referred to, since the plaintiff requested, and was refused, a general peremptory instruction in their favor under all of the proof in the case.

As to the second issue stated in Paragraph 3 of this opinion, which involves the question of whether (a) the technician was guilty of negligence when he mislabeled the blood in the manner hereinbefore stated and thereby caused the wrong type of blood to be used in a transfusion for Mrs. Holmes when he knew, or should have known, as an experienced laboratory technician, that it would prove exceedingly dangerous to administer Type "2" blood to a Type "4" patient by a blood transfusion; and (b) whether or not his act in that behalf was the proximate, or a contributing, cause of her death, the answer is in the affirmative.

The procedure followed by the technician, according to the undisputed evidence, was that on the night of June 16, 1949, he received at the laboratory a written requisition from Dr. C. E. Lewis which called for the typing of the blood of his patient, Mrs. Holmes, who was in Room 412 of the hospital, in order that the same could be used for a blood transfusion on the next morning; that the technician proceeded to her room, drew some blood from her arm, poured the same in two tubes, which were similar to test tubes, and then proceeded to the nurse's desk on that floor where he obtained the routine laboratory slip from the chart of the patient which contained her admission number, the doctor's

name, the name of the patient, the date of admission and who was responsible for the bill; that he thereupon rolled or folded this slip and placed it in a hole in a tray immediately behind the two holes thereon which contained the two tubes of blood, there being three of such holes in a row from front to rear, and the slip identifying the patient and her blood being placed in the hole on the tray next to the technician as he would carry it down the hall to the laboratory; that while at the nurse's desk his attention was called to the fact that another doctor desired that a Mrs. Holder's blood be typed, she being in another room on the same floor of the hospital, and thereupon he proceeded from the nurse's desk to Mrs. Holder's room with her routine laboratory slip and went through the same procedure that he had just followed in the case of Mrs. Holmes, using three other holes located elsewhere on the tray to deposit the other two tubes of blood and the identification slip; that thereupon he proceeded to the laboratory with his tray containing the four tubes of blood, separated and distinguished in the manner aforesaid; that he then correctly typed and accurately cross-matched the blood of each of these two patients, finding that Mrs. Holmes' was Type "4" and Mrs. Holder's blood was Type "2"; that in cross-matching the blood he matched the blood serum of the intended donor with the blood cells of the patient and then matched the blood serum of the patient with the blood cells of the intended donor; and that thereupon he undertook to label the blood prepared in each instance for use in the transfusions by using the information which he had before him on their respective routine hospital laboratory slips and filled out the labels so that they contained the name, room number, and type of blood of each patient, respectively, but he wrote on the label, which contained the name of Mrs. Holmes and her room number, etc., the notation "Group 2", meaning Type "2" blood, instead of Type "4", and then wrote on the other label

under the name of Mrs. Holder and her room number, the notation "Group 4", meaning Type "4" blood. The only explanation that he could give for his action in so doing was that he erroneously placed on the label the name of Mrs. Holmes and her room number after having noted on the label the blood as being Type "2", or on the other hand that he noted the wrong type of blood on the label after having otherwise filled out the same as to her name and room number, etc., and then made a similar error in following the same procedure in filling out the other label.

In view of the knowledge and experience that this technician had acquired in the typing and crossmatching of blood for transfusion, he necessarily knew that it was very dangerous to give a Type "4" patient the blood of a Type "2" patient, and it was therefore incumbent upon him to exercise due care not to mislabel the blood by interchanging the type numbers on the portions to be used for each patient, and was guilty of actionable negligence in not correctly identifying the type of blood intended for each.

As to whether or not the negligent act in the foregoing particulars was the proximate, or a contributing, cause of the death of Mrs. Holmes, the proof discloses that the blood transfusion was started the next morning at approximately 8:00 o'clock while the patient was undergoing surgery, and was continued until she had been given about 700 c. c. of blood, labeled as "Group 2", when it was discovered that her hands had turned to a blue color around the fingernails and that her face disclosed a like discoloration, and both of which then turned to an ashen gray as her blood pressure dropped from 110 to 60, her pulse increased from 120 to 130 and on to 150, and finally her pulse soon became almost imperceptible. Her physician, knowing that the operation had proceeded normally, and apparently without any unfavorable reaction, decided to reopen the abdominal cavity to the extent of ascertaining whether or not there was

any bleeding, and finding none he concluded that something else had gone wrong, and with the result that the chief pathologist and director of the laboratory, Dr. Forrest G. Bratley, caused some of the patient's blood to be obtained and again typed, when it was found to be Type "4", and thereupon another transfusion was begun by the use of blood of her own type to counteract the very grave condition which her physician believed had been produced by the original transfusion, and she then revived to some extent but later the condition of the patient grew worse until she died at approximately 10:30 or 11:00 o'clock on the following morning, that is to say on June 18, 1949. And the proof disclosed by the testimony of the physicians, introduced as witnesses both on behalf of the plaintiffs and the defendants, was to the effect that administering Type "2" to a Type "4" patient would produce the results hereinbefore mentioned, that it would cause the blood of the patient to become agglutinated, the kidneys to become blocked, and that this result would cause death.

But, as against the concessions of the experts that the giving of Type "2" blood to a Type "4" patient would produce the symptoms noted in the case of this patient, most of them testified that the cause of the death of any patient could not be determined with a reasonable degree of certainty without an autopsy being performed, which was not done in the instant case. They were of the opinion, and so testified, that while the giving of the wrong type of blood, and especially Type "2" blood to a Type "4" patient, would produce the symptoms noted in this case, including resultant shock, the lowering of the blood pressure, and the increasing of the pulse, the same symptoms could have been produced by the operation causing an embolus or "blood clot", to form, resulting in death, or that other conditions arising in connection with the surgical operation or brought about by other infirmities, such as a heart condition, etc., could have caused the death of this patient. But we think that the answer to this con-

tention is that the plaintiffs were not required to prove to a moral certainty and beyond every other reasonable hypothesis the exact cause of the death complained of; they were only required to show from a preponderance of the evidence that the opinion of her attending physician, based upon what he observed at the time as to the cause of her death, should be accepted by the jury to be true, as a reasonable probability. He filled out the death certificate in this instance showing that the patient died from "acute hemolytic anemia, due to blood transfusion of wrong type,"—a condition that may be produced as a reasonable probability according to the admission of the expert witnesses,—and he testified at the trial that such was still his opinion. Some of the other witnesses conceded that her attending physician who observed and watched the effects of the transfusion of the wrong type of blood for many hours after the same was administered should be in a better position to express an opinion as to the cause of her death than anyone else, even though most of the expert witnesses would not concede such to be the case and insisted that an autopsy would have been necessary to determine the cause with any reasonable degree of certainty.

To illustrate that these experts in giving their testimony that something else could have happened had in mind reasonable possibilities as against the contention that the transfusion of the wrong type of blood had in fact caused her death as a reasonable probability, some of them testified that if one should see a person shot in the head with a pistol and then see the victim fall over and die instantly, an autopsy would still be necessary in order to determine the cause of death with a reasonable degree of certainty. This high degree of proof is not even required in homicide cases. Men are convicted of murder or manslaughter and put to death or sent to the penitentiary upon proof of the fact that they shot their victim and that he thereafter died as a proximate result thereof, where no autopsy has been performed. ▆▆ ▆

In a civil case, a jury is only required to believe from the greater weight of the evidence that the result complained of was proximately caused, or contributed to, by the negligent act of the defendant. We are therefore of the opinion that the verdict of the jury in finding that the death of Mrs. Holmes was proximately due, in whole or in part, to the negligent act of the technician in this case is amply supported by the evidence.

This brings us to a consideration of the third and final issue in the case, that is to say whether or not the defendant hospital is liable in damages for the negligent act of its employee, even though the record fails to show that its governing authorities were negligent in his selection, employment or retention as a laboratory technician, the liability to rest upon the theory that *qui facit per alium facit per se.* Such liability was denied under some of the former decisions of this Court referred to in Paragraph 4 of this opinion, and this is clearly true under the holding of the Court in the cases of Mississippi Baptist Hospital v. Moore, Pace v. Methodist Hospital, and International Order of Twelve of Knights & Daughters of Tabor of Mississippi v. Barnes referred to in the said paragraph. In the cases of Eastman, Gardiner & Co. v. Permenter and James v. Yazoo & M. V. R. Co., the corporate defendants, Eastman, Gardiner & Co. and the Yazoo & M. V. R. Co., respectively, were most assuredly not charitable institutions. In the first of these two cases, the defendant was a lumber company and collected $1 monthly in deductions from the wages of each employee thereof, promising in return medical attention, aside from surgery and obstetrics, for the employee and his family, and turned over the entire amount of such collections to one it deemed to be a competent and skilled physician as payment for his services to the employees, without pecuniary profit to the lumber company, and the employer was held not liable for the negligence or unskillfulness of the physician or surgeon employed, provided it had exercised due care in selecting him. Therefore, if the

character of the defendant, as a charitable institution, is to be the test as to immunity from liability, as contended for by the defendant hospital in the instant case, the decision would not be applicable here, since the defendant in that case was neither a charitable institution nor a corporate defendant which received and retained as its own any fees collected for the services rendered. And in the second case last above mentioned, the Yazoo & M. V. R. Co. established a hospital for the mutual benefit of itself and its employees from mutual contributions and received no pecuniary profit itself from the contributions, and the railroad company was held not liable for the negligence or unskillfulness of a physician or surgeon employed at the hospital, provided it had exercised due care in selecting the physician or other employees involved. The suit was not against the hospital but against the railroad company, which could in no sense be termed a charitable institution within the meaning of the rule which would exempt a charitable corporation from liability for the negligence of its employees, according to the general acceptation of the immunity doctrine as applied to corporations which have been chartered as charitable institutions.

We shall therefore confine this discussion to the question of whether or not the cases of Mississippi Baptist Hospital v. Moore, Pace v. Methodist Hospital and International Order of Twelve Knights and Daughters of Tabor of Mississippi v. Barnes should now be overruled, it appearing that the case of Rhodes v. Millsaps College is distinguishable on its particular facts from the three hospital cases above mentioned.

The three hospital cases here under consideration, and wherein the injuries complained of were done to pay patients, if followed in the instant case would necessitate a reversal of the judgment appealed from herein. They declare that where a patient is injured in a charitable hospital by the negligence of an employee, the remedy of the person injured is against the employee alone

whose negligence caused the injury, and not against the hospital, where such hospital has exercised due care and caution in the selection, employment or retention of such employee. The Moore case cites as the sole authority for the decision the Permenter and James cases. The Pace case cites as the sole authority for the decision therein the Permenter, James and Moore cases, and the Barnes case cites as the sole authority for the decision those four previous cases. Nevertheless, it is to be conceded that they are in accord with the decisions of the courts of many other states, but in conflict with many cases from other jurisdictions, some of which hold in favor of liability on behalf of strangers and "paying patients" who may be injured through the negligence of an employee of a charitable institution, some for liability in favor of any person so injured or killed, whether stranger, paying or charity patient, and others denying relief only as to the beneficiaries of the charity. Some hold in favor of absolute immunity and others for total liability, but a majority of the courts permit strangers to the benefits of the charity to recover.

We are not concerned in the instant case with the question of whether or not a charity patient would be entitled to recover if injured through the negligence of an employee of a hospital which is chartered and operated as a charitable institution; nor are we concerned with the question of whether or not a student who pays tuition in an amount far below the cost of furnishing him the facilities offered by a denominational college, or other institution which is operated as a charitable one, is entitled to recover damages for the negligence of an employee thereof, but we are concerned here with the question alone as to whether or not a "paying patient" who has been injured through the negligence of an employee of a hospital which is rendering service for the most part to "paying patients", or rather whether the heirs at law in this case on account of the death of the patient because of such negligence, are entitled to recover, where full

compensation has been paid to the hospital for the room, board and the other services rendered by the hospital employees, and where the patient has therefore not received the benefit of any charitable work done by the institution. We confine this decision to that issue alone.

The proof discloses in the testimony of one of the trustees of the defendant hospital upon the trial in February 1950 that the institution had done during the previous year about $1,200,000 worth of hospital services. That of this amount approximately $50,000 represented the value of services rendered to charity patients and also that the hospital failed to collect about $50,000, included in the total amounts above stated, for services to patients who had entered as pay patients, but who failed to pay, and which amount of charity and lost accounts should have left approximately $1,100,000 of income collected from patients who paid for the services rendered them. This is the only testimony in the record on the question of whether or not this hospital receives compensation for most all of the hospital services rendered in comparison with the amount of charity work done and the amount lost on bad accounts. Most all privately owned hospitals likewise do charity work, and for which they receive in return certain exemptions in the matter of taxation, and of course the defendant hospital in the instant case is likewise relieved of a considerable amount of state, county and municipal taxes, together with income taxes to the federal government usually paid by privately owned hospitals. It is entitled to these considerations as a non-profit hospital within the meaning of the tax exemption laws as a charitable institution. As hereinbefore stated, it pays no profit to its incorporators or owner and has no capital stock, and we shall therefore, deal with its claim of immunity from liability for the negligence of its employees upon the theory that it is in truth and in fact a charitable institution, even though the proof discloses that its earnings though the years have been devoted to the expansion of its building and

equipment facilities to the extent that the book value of its entire property is now approximately $1,000,000.

In the case of Miss. Baptist Hospital v. Moore, supra [156 Miss. 676, 126 So. 468], it was said: "This court has decided that charitable institutions administered solely for charity and not for benefit, and which do not receive profit from the operation of such institutions, are not liable for the negligence of their servants and physicians, where the hospital has exercised due care and caution in selecting such agents and physicians." In that case it was shown that the hospital carried a liability insurance policy, as in the instant case, to protect it against any liability imposed by law for the negligence of the employees of the hospital. But the Court held in the Moore case that nevertheless the hospital would not be liable if it had exercised reasonable care in the selection, employment or retention of such employee.

In the case at bar there was a motion to strike from the answer of the hospital the allegations of nonliability which were based upon the ground that it is chartered and operated as a charitable institution which has never issued any stock, had paid no profit or dividends to its incorporators or owner, the Mississippi State Baptist Convention, but had at all times devoted its entire income and revenues to the purposes set forth in the latter part of paragraph three of this opinion. Whereupon, there was introduced (out of the presence and hearing of the jury) in support of the motion to strike such portion of the hospital's answer, a certain liability insurance policy in the sum of $25,000 as to each patient, which was carried by the hospital in the Aetna Casualty & Surety Company of Hartford, Connecticut, and purports to insure the hospital against any liability *imposed by law* for damages, etc., the purpose of such proof being to show, or to attempt to show, that in the event of a recovery against the hospital the judgment would not have to be paid out of any trust funds that are donated or otherwise received for charitable purposes, this being

one of the grounds upon which the doctrine of immunity of charitable institutions from liability for the negligent acts of their employees has been predicated by some of the courts in other jurisdictions as well as our own, when due care has been exercised in the selection or employment of the negligent employee.

The motion to strike such portion of the hospital's answer was overruled by the trial court and the case was submitted to the jury on the sole issue of whether or not the hospital had exercised reasonable care in the selection, employment or retention of the technician whose negligent act is alleged to have proximately caused the death complained of.

However, it appears that the information in regard to the liability insurance policy reached some of the jurors, through news items in the local papers which had stated that a witness had testified in the absence of the jury in regard to such insurance policy, and it is claimed by the hospital that this fact was prejudicial to such defendant and was influential with the jury in the rendition of the judgment appealed from.

In the above connection, it has already been noted herein that the plaintiffs requested, and were refused, a peremptory instruction in their favor on liability, which would have included liability both on the question of whether or not the hospital had exercised reasonable care in the selection, employment or retention of the employee whose negligent act may have caused the death of Mrs. Holmes, and also on the question of whether or not the hospital was liable for the negligent act of its technician as the proximate, or contributing, cause of the patient's death even though the hospital may have exercised reasonable care in the selection, employment or retention of the said employee. If, therefore, the plaintiffs were entitled to the peremptory instruction as requested, we would not reach the question of whether it was error for the trial court not to order a mistrial on the ground that information in regard to the liability

insurance had reached the jurors, since it was held in the case of Murry Chevrolet Company v. Cotten, 169 Miss. 521, 152 So. 657, that where plaintiffs in a death action are entitled to a peremptory instruction, and have requested the granting of the same, the erroneous rulings of the trial court become immaterial. But be that as it may, the verdict of the jury necessarily involves a finding that the technician was negligent and that his negligence constituted a proximate, or contributing, cause of the death complained of. It would therefore serve no good purpose to order a retrial unless the verdict should be held excessive. This seems to be the well-settled rule in this State as to any errors committed on the trial of a civil case, unless the same have resulted in the verdict being grossly excessive.

The appellant hospital, in its motion for a new trial, assigned as one of the grounds therefor that the verdict of the jury was grossly excessive, and again in the assignment of error filed on appeal here that the trial court erred in overruling appellant's motion for a new trial, but this assignment of error is not argued in the brief as to any alleged excessiveness of the verdict. A casual observation is made in the brief of the appellant to the effect that the verdict was excessive, though not specifically mentioned in the assignment of error; but in arguing here that the motion for a new trial should have been sustained, the appellant bases its contention in that behalf solely on the ground that the verdict of the jury was against the overwhelming weight of the evidence in finding that the governing authorities of the hospital had failed to exercise reasonable care in the selection, employment or retention of the laboratory technician and that his negligent act was the proximate cause of the death of the patient.

But, in view of our conclusion that the jury's verdict was correct in finding that the employee was negligent and that his negligent act was the proximate cause of the death of the patient, we deem it unnecessary to con-

sider the effect of the information received by the jurors, as to the liability insurance policy or any alleged errors in the instructions, since we are of the further opinion that the plaintiffs were entitled to the general peremptory instruction as requested on the liability of the defendant hospital, and that the insurance question could have only affected the amount of the verdict, the alleged excessiveness of which being neither argued in the briefs nor at the bar as aforesaid. Moreover, the patient was a woman of about thirty-five years of age, and in such state of health as to be able to perform her housework on the day that she went to the hospital and prior thereto, and whose death, as a good wife to her husband, and mother to her children, has resulted in a great loss to them at least to the extent that the verdict cannot be held excessive under all of the facts of the case.

For the foregoing reasons we do not feel justified in ordering a retrial of this case—which consumed two and one-half weeks—and to do so merely on the ground that the case was submitted to the jury on an issue of fact in support of which there was not sufficient evidence of a substantial nature offered by the plaintiffs to justify such submission. If a charitable hospital is liable for the torts of its servants the same as any private individual or other corporation where a paying patient is injured through the negligence of one of its employees, and death occurred as a proximate result thereof, then the plaintiffs were entitled to the peremptory instruction as requested; wherefore, the submission of the case to the jury on the wrong issue and the other alleged errors complained of would become wholly immaterial. We therefore proceed to a determination of whether we should continue to recognize the rule of immunity stated in the three hospital cases mentioned in Paragraph 4 of this opinion, or should follow the more logical rule of liability that has been adopted in a number of other states as being in keeping with the principles of right and

justice and supported by the great body of the general law on the subject of liability for negligence.

It should be first recognized that the "rule" which grants immunity from liability for the negligent acts of the servants and employees of charitable institutions is itself an exception to the general principles of liability; that the law on the subject is now, and has been for the past several years, in a state of flux; that in those states where the courts are unfettered by any precedent in their own jurisdiction on the question, they have declined to subscribe to such doctrine because it has been fully demonstrated in the opinions of a number of courts, such as those in the case of President and Directors of Georgetown College v. Hughes, 76 U.S.App.D.C 123, 130 F. (2d) 810; Ray v. Tucson Medical Center, 72 Ariz. 22, 230 P. (2d) 220; Haynes v. Presbyterian Hospital Ass'n, 241 Iowa 1269, 45 N.W. (2d) 151; Tucker v. Mobile Infirmary Ass'n, 191 Ala. 572, 68 So. 4, L.R.A.1915D, 1167; Nicholson v. Good Samaritan Hospital, 145 Fla. 360, 199 So. 344, 133 A.L.R. 809, and in numerous other decisions cited in Haynes v. Presbyterian Hospital Ass'n, supra, including Moore v. Moyle, 405 Ill. 555, 92 N.E. (2d) 81, and also the somewhat recent case of Sheehan v. North Country Community Hospital, 273 N.Y. 163, 7 N.E.(2d) 28, 109 A.L.R. 1197, that most, if not all, of the theories upon which the doctrine of immunity has been created by the courts (the decisions of which stem from the case of McDonald v. Massachusetts General Hospital, 120 Mass. 432, 21 Am.Rep. 529, which rested on the supposed authority of the English cases of Heriot's Hospital v. Ross, 12 Clark & Fin. 507, 8 Eng. Reprint 1508, and Holiday v. St. Leonard, 11 C.B., N.S. 192, which had been repudiated in England ten years prior thereto and were never thereafter followed in the English or Canadian courts) are wholly illogical and inconsistent with the reasons given therefor.

Moreover, the scholarly treatment of the doctrine outside of the courts by text writers and eminent authors

of articles in law journals are almost uniform in their criticisms of this doctrine of immunity in favor of charitable institutions against liability for the tortious acts of their employees; and as pointed out in the case of Georgetown College v. Hughes, supra, the judicial discussions favoring this doctrine of immunity have been set in the pattern of the early Massachusetts case, McDonald v. Massachusetts General Hospital, supra, and the opinions continue to speak in this set pattern, even when repudiating the grounds for retaining it; that the judicial debate continues around the "modifications" which should be made of the rule, and the debate has gone on constantly in the courts of this country, not so much as to whether, but concerning how far, it should be modified, indicating (that something was wrong at the beginning, or) that something has become wrong with the rule since it was adopted by many of the courts.

In response to what appeared good as a matter of public policy at an early date, many of the courts have created an immunity, which, under all legal theories, is basically unsound, and especially so, when the reason upon which it was founded no longer exists. Morover, the function of creating a public policy is primarily one to be exercised by the Legislature and not by the courts. It is equally true that when the reason for the existence of a declared public policy no longer obtains, the court should, without hesitation, declare that such policy no longer exists, and especially where the same has been created by the courts instead of by the Legislature.

The foundation of this immunity doctrine in favor of charitable institutions is based (1) upon the ground that the payment of damages for an injury caused by the employee of such an institution would divert the trust funds thereof from the purposes for which the institution was established and would discourage future donations to the same if the contributions are devoted to a purpose other than that intended by the donors; or that (2) it wrongfully extends the doctrine of respondeat superior to em-

brace corporations engaged in business not operated for profit; or that (3) by accepting the treatment received, a patient assumes the risk of negligence and impliedly agrees to waive liability for injury caused by the negligent acts of the employees of the charitable institution; or that (4) it would be better that the injured person, such as a patient at a charitable hospital, suffer his injury without recompense than that such hospital be required to pay the damages caused him through its negligence.

The attempted application of the principle first stated in the foregoing paragraph has been wholly inconsistent with reason and contrary to its own objective, since a majority of the courts holding to the doctrine of immunity now permit all third persons other than patients at such a hospital to recover for injuries received through the negligence of a hospital employee or through the negligence of its governing authorities, such as when a stranger to the charity is run over in the street by a hospital ambulance driven by one of its employees, or where they are injured while visiting a relative or friend in the hospital by coming into contact with a pushcart in the corridor or riding on a defective elevator, or otherwise. Then, too, employees are allowed to recover for injuries sustained while operating a defective elevator or because of any other negligence of the hospital. In several states "paying patients" are allowed to recover for injuries received through the negligence of a hospital employee on the ground that he is not a recipient of the bounty of the contributors to the institution but pays full compensation for the services and accommodations afforded him, and is therefore entitled to be dealt with in a prudent and careful manner. And all patients, whether paying or nonpaying, are permitted to recover under the decisions of the courts in some states, including our own, where the governing authorities have been negligent in the selection, employment or retention of the

employee whose negligent act may have caused an injury to the patient.

Thus it will be seen that the modifications of the theory that the funds of such an institution should not be diverted to a purpose other than that intended by the contributors to the charity have virtually demolished this ground of nonliability, since it is no less a diversion of the funds when they are used to pay judgments in favor of strangers, employees, or paying patients than it is to use such funds to pay for an injury to a charity patient. But many of the courts deny relief to any patient of such hospital, whether a pay or nonpay patient on the grounds that each of them are beneficiaries of the charity. But we cannot subscribe to this view as applied to a patient who pays full compensation for his room and for the medical and other services rendered him by the hospital, since the theory of the hospital's immunity as to patients in either category is that in accepting the benefits of charity the patient is held to have waived all liability for the negligence of the employee. There is no consideration in the instant case to support such a waiver by the full-paying patient, it being admitted in the testimony that a profit is made on those who pay the price charged them for their room, etc.; and we express no opinion as to the soundness of the waiver theory as applied to a charity patient, since no injury to such a patient is involved in the instant case.

As to the theory that liability would wrongfully extend the doctrine of respondeat superior, and that such doctrine should not apply to a patient in either category on the ground that the negligent employee is not working for the benefit of the institution but for the good of the general public, it is likewise inconsistently applied by the courts adopting the same, for the reason that the institution is held liable under the doctrine of respondeat superior where a stranger or employee is injured through the negligence of an employee; and such doctrine is also applied in most cases when the hospital is held liable to an

injured patient for the negligent act of an employee who has been selected, employed, or retained without the exercise of reasonable care on the part of the governing authorities of such an institution. Moreover, there is no sound legal principle under which the doctrine of respondeat superior should be inapplicable to a charitable institution and at the same time applicable to a hospital privately owned and operated by individual doctors who likewise render charitable services to patients when it becomes imperative that it be done. Nor is there any logical reason why the doctrine of respondeat superior should be applied to the negligent acts of the servants of corporations engaged in other commercial enterprises and at the same time be held inapplicable as to the negligent acts of charitable institutions which are now operating in the field of big business and on a large scale. There is no need for the application of either of those grounds of the immunity doctrine where liability insurance is available to such latter institutions the same as to the former to protect themselves from the diversion of their earnings to the payment of judgments for damages recovered against them, and especially where the premiums for such insurance can be paid as an item of the cost of operation without unduly impairing their earnings for use in the operation of their business.

We would not, however, make the *existence* of liability insurance the criterion of liability, but we merely emphasize its *availability,* together with the practice on the part of many people of carrying hospital insurance, and call attention to these considerations as a persuasive argument in favor of applying the general law on the subject of negligence in suits against charitable institutions which derive the larger portion of their *earnings* from pay patients.

As heretofore indicated, we are unable to follow the third theory hereinbefore mentioned to the effect that a pay patient who pays full consideration for the accommodations and services rendered by such a hospital

should be held to have assumed the risk of negligence and to have impliedly agreed to waive liability against the institution for torts committed by it or its employees. In the 1921 Michigan Law Review, Vol. 19, pp. 395 to 412, is to be found an article on Damage Liability of Charitable Institutions, wherein it was said: "The objection to this theory (of waiver) is that it does violence to the facts, 'A patient entirely unskilled in legal principles, his body racked with pain, his mind distorted with fever, is held to know, by intuition the principle of law that the courts after years of travail have at last produced.' " And as was said in the case of Gamble v. Vanderbilt University, 138 Tenn. 616, 200 S.W. 510, 512, L.R.A.1918C, 875, "There are cases from time to time occurring, and not altogether infrequent, to which it is, as it seems to us, impossible to apply it", as, for instance, patients conveyed to hospitals in a demented condition, persons temporarily unconscious from injuries and who require immediate surgical and other attention, those who are so debilitated by disease as to have no power of understanding the terms of a contract, children too young to understand the meaning of a contract, or to make or be bound by one in any form, or even to understand the nature of the work to be done for them. How then can a patient who pays, and is required to pay, a full and adequate consideration for the accommodations and services to be rendered him, be held to assume the risk of the negligence of a hospital employee or to have waived, without any consideration to support the waiver, the liability of the institution for such an act of negligence?

As to the fourth ground claimed as a basis for the doctrine of immunity, it is based upon the theory that it is deemed better that the individual bear his injury without recompense rather than that the institution should be liable in damages therefor. This theory of nonliability if applied to a pay patient, when injured by the negligence of an employee of the hospital, is to compel him to donate to charity the amount he would otherwise be

entitled to recover for his injuries, whether he is willing to do so or not, and all in order that others may receive charity while he suffers from an injury which has been negligently inflicted upon him.

As was said in Georgetown College v. Hughes, supra [76 U.S.App.D.C. 123, 130 F.(2d) 827], "The law's emphasis ordinarily is on liability, not immunity, for wrongdoing. * * * The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. * * *"

In the case of Sheehan v. North Country Community Hospital, supra [273 N. Y. 163, 7 N. E. (2d) 29.], the Court of Appeals—the highest court in the state of New York—took cognizance of, and approved, the contention that to impose liability upon a charitable institution as well as on individuals and other corporations for the negligence of an employee is to beget careful treatment, that is to say, care and not carelessness, "and that no conception of justice demands that an exception to the rule of respondeat superior be made in favor of the resources of a charity and against the person of a beneficiary injured by the tort of a mere servant or employee functioning in that character." And that court expressed the opinion that the "greater weights" are in favor of liability.

Somewhat recently, in the cases of Ray v. Tucson Medical Center, and Haynes v. Presbyterian Hospital Ass'n, supra, the Courts of Arizona and Iowa each overruled two of their former decisions in a departure from the immunity doctrine theretofore announced, and declared in favor of the liability of charitable institutions for the negligence of any of their employees. The Courts of Alabama, Florida and Vermont, not being hampered by any of their previous decisions, likewise rendered opinions which we think are of unanswerable logic in holding

that charitable institutions should be held liable to pay patients for the negligence of their employees the same as individuals or other corporations are held to be liable. The opinions in the two pay patient cases from Alabama and Florida, respectively, Tucker v. Mobile Infirmary Ass'n and Nicholson v. Good Samaritan Hospital, together with those in the cases of Georgetown College v. Hughes, Ray v. Tucson Medical Center, Haynes v. Presbyterian Hospital Ass'n, supra, and Foster v. Roman Catholic Diocese of Vermont, 116 Vt. 124, 70 A.(2d) 230, have clearly demonstrated that the four grounds hereinbefore mentioned as the sole foundation upon which the immunity doctrine in favor of charitable institutions is based are altogether illogical, and that the reasons given for them are inconsistent with each other and with the dictates of right and justice; and that the area of protected negligence created by the decisions which still adhere to absolute immunity, except where there has been negligence in the selection, employment or retention of the employee, is an area that should no longer be recognized. The trend of decisions in at least ten of the states is now in favor of liability in favor of patients, the same as in favor of strangers and employees; but as hereinbefore emphasized, we are dealing here only with a claim for injury to a paying patient.

All that the defendant hospital has at stake in our failure to adhere to the former decisions which limited its liability to cases only where there was a lack of reasonable care exercised in the selection, employment or retention of the employee, whose negligent act may have caused the injury or death of a patient, is the probable increase of insurance protection against liability for the negligence of all employees without regard to whether or not they have been prudently and carefully selected and employed; together with the inconvenience of litigating additional contested cases of alleged liability. Moreover, it would be in keeping with the Christian and philanthropic spirit of the contributors to a charitable

institution that a patient who has paid more than cost of the services rendered by the institution should be compensated for a wrongful injury done through the negligence of one of its employees.

As to the trend against immunity the following additional authorities are of interest, to wit: Prosser on Torts, page 1084; Scott on Trusts, Vol. 3, page 2150, Sec. 402; Glavin v. Rhode Island Hospital, 12 R.I. 411, 412, 34 Am.Rep. 675; O'Connor v. Boulder Colorado Sanitarium Ass'n, 105 Colo. 259, 96 P.(2d) 835, 133 A.L.R. 819; England v. Hospital of the Good Samaritan, 14 Cal.(2d) 791, 97 P.(2d) 813; Sandwell v. Elliott, 92 N.H. 41, 24 A. (2d) 273; Gable v. Salvation Army, 186 Okl. 687, 100 P.(2d) 244; Dillon v. Rockaway Beach Hospital & Dispensary, 284 N.Y. 176, 30 N.E.(2d) 373; Haliburton v. General Hospital Soc. of Conn., 133 Conn. 61, 48 A.(2d) 261; Rickbeil v. Grafton Deaconess Hospital, 74 N.D. 525, 23 N.W.(2d) 247, 166 A.L.R. 99; 10 Am.Jur., Charities, Sec. 143; 14 C.J.S., Charities, Sec. 75; and for articles by law writers supporting the view of the cases herein cited from other jurisdictions see the 1936 publication of American Bar Ass'n Journal, Vol. 22 page 48; 34 Yale Law Journal 316; 14 Boston U.L.Rev. 247; 22 Virginia L.Rev. 58, and 48 Yale Law Journal 81. It is true that there are at least as many decisions to the contrary, which are in point on the immunity doctrine in favor of charitable institutions, among which is the case of Ettinger v. Randolph-Macon College, 31 F.(2d) 869, wherein the opinion was written by the eminent jurist Judge Parker of the Fourth Circuit Court of Appeals, but in that case it was pointed out that the tuition paid by the injured student was sufficient only to pay a part of the cost of affording the student the facilities of the college, and he was to that extent a recipient of charitable benefits; that is to say, the facts, at least, presented a different case to that now before us.

As pointed out in the case of Haynes v. Presbyterian Hospital Ass'n, supra, at the outset of the theory of im-

munity, hospitals were relatively few in number and were created and conducted solely by funds donated by public spirited people, and therefore devoted purely to charity. The granting of immunity to the hospitals which were then devoted purely to charitable purposes was proper as a basis for encouraging them. But now a vastly different situation prevails. The hospital of today has grown into an enormous business, if not largely into a commercial enterprise. They own and hold large assets, most, if not all, of which are tax free, and both the Federal and State Governments have become paternal to an astonishing degree. Liability insurance is available as an answer to the primary argument made in the past in support of the doctrine of immunity of these institutions, that is to say, the argument that to require the payment of judgments for damages would divert its revenues to other than charitable purposes; and the other three grounds urged for retaining the doctrine of absolute immunity have crumbled as a foundation therefor under the test of reason.

And finally, it should be said that the tendency of immunity is to foster neglect, and that the tendency of imposing liability is to induce care and caution in the treatment of those for whom these institutions were established. Neither the encouragement of charity and philanthrophy nor the doctrine of immunity on the ground of public policy can dispel the fact that the primary interest and welfare of the public requires that one person should not suffer an injury to his or her life or limb without recompense merely in order that all of the earnings of a charitable hospital should be devoted to the purpose of providing charity for others.

Throughout this opinion we have dealt with the status of the defendant hospital as being that of a charitable institution, since the case was tried and has been briefed and argued here upon that theory. The record fails to disclose what portion of its gross income for services rendered may represent net earnings, even though the

same may be used for expanding its program for buildings and equipment. However, the proof does disclose that a profit is made on the room and services afforded to a pay patient, who pays the usual charges made to one able to pay, as is the case here, and that therefore such a patient is not a recipient of any charity even though we assume, as we have done, for the purpose of this decision, and for that purpose alone, that this hospital is a charitable institution.

With due regard for the great work being done by the charitable hospitals, and with the utmost respect for the courts that adhere to the contrary view to that entertained by us, and particularly the personnel of our own Court who rendered our former decisions on the subject, all of the Judges and Commissioners who now compose this Court are unanimously of the opinion that the defendant hospital should be held liable to the same extent for the negligent act of its employee which proximately caused the death of Mrs. Holmes as it would have been had its governing authorities failed to exercise reasonable care in his selection, employment or retention; that therefore the former decisions of this Court, particularly the decisions in the Moore, Pace and Barnes cases, should be, and the same are hereby, overruled to the extent that anything said in the opinions rendered therein are inconsistent with the views hereinbefore expressed; and that therefore the judgment of the trial court in favor of the plaintiffs should be affirmed.

Affirmed.

### On Suggestion of Error

**Lee, J.**

The orginal opinion recognized that, prior to its rendition, a charitable institution in this State was liable for the negligence of its agents only when its governing authorities were guilty of negligence in the selection, employment or retention of such agents. Mississippi

Baptist Hospital v. Moore, 156 Miss. 676, 126 So. 468, 67 A.L.R. 1116; Pace v. Methodist Hospital, Miss., 130 So. 468; and International Order of Twelve of Knights and Daughters of Tabor of Mississippi v. Barnes, 204 Miss. 333, 37 So.(2d) 487.

In the third and fourth paragraphs of that opinion, we also recognized that this cause was submitted to the jury in the trial court [55 So.(2d) 144] on the issues above stated, "together with whether or not the technician was negligent and (if so whether) his negligent act was the proximate cause of the patient's death * * * ". It was admitted both by the pleadings and the proof that the technician was the employee of the defendant hospital at the time he performed the act complained of. We undertook to demonstrate that the act of the technician was a negligent one, and that such fact was not debatable. Under the facts therein set forth, it was also shown that the negligent act of the technician proximately caused, or contributed to, the death of the patient. The verdict of the jury necessarily involved a finding, (1) that the technician was employed by the defendant hospital, which fact was not in dispute; (2) that the act of the technician, in causing the wrong type of blood to be administered to the patient, constituted negligence; and, (3) that such act of negligence caused or contributed to the death of the patient—all as required by the doctrine of respondeat superior.

In the original opinion, we expressly overruled the Moore, Pace, and Barnes cases, supra, and held the defendant hospital to be liable under the doctrine of respondeat superior. The trial court had followed those cases in refusing to submit to the jury the count of the declaration which relied on the doctrine of respondeat superior. The jury was therefore instructed that unless the plaintiffs had shown by the preponderance of the evidence that the hospital failed to exercise reasonable care in the selection, employment or retention of the technician, and that the technician was negligent, and that his

negligent act was the proximate or contributing cause of the patient's death, they should find for the hospital. Under the instructions, the jury had to believe that the technician was the employee of the hospital, that he was negligent, and that his negligence caused or contributed to the death of the patient. In other words, the jury was required to believe that all of the elements of liability under the doctrine of respondeat superior existed in connection with the injury and death, even though the instructions further required the plaintiffs to carry the additional burden of showing that the governing authorities of the defendant hospital had failed to exercise reasonable care in the selection, employment or retention of the technician involved.

But we are now asked to reverse and remand the case for a new trial in order to permit the jury to apply the "new law"—liability under the doctrine of respondeat superior—which is announced in the overruling of the three cases hereinbefore mentioned, and we are asked to do this, notwithstanding that the jury on the former trial had found the facts to be such that the Court should apply the law of respondeat superior.

Appellant contends that the judgment of the lower court should be reversed, and a judgment entered for it here, because a peremptory was granted by the trial court as to count 5—respondeat superior—from which no cross-appeal was prosecuted, and that the original opinion held that the evidence was insufficient to make an issue for the jury on counts 1 and 2—the alleged negligent selection, employment or retention.

The approval of that contention would effect a quirk in the administration of justice. Although the Court has recognized and declared that great damage was sustained by the appellees, yet it would thereby confess its inability, on account of form, to grant redress. This would be the equivalent of holding that fault in the method of asserting rights destroys such rights altogether—form must take precedence over substance.

The appellees asserted liability on the doctrine of respondeat superior. Their proof sustained that position, and they requested a directed verdict. Moreover, they informed the court, when it was considering the peremptory on that ground, that they were building their record in order to ask this Court to overrule the cases, which denied recovery against charitable institutions on that ground. Consequently, this question was involved in the pleadings and proof and in the record of the case.

In Yazoo & M. V. R. Co. v. Hawkins, 104 Miss. 55, 61 So. 161, 451, 452, this Court said: "the court did not deem it controlling upon this court how the case was presented in the court below; but the court endeavored to try the case upon the record as made by the pleadings and evidence in the court below, and to base its decision thereon. * * *

"It may be proper to add that the theories adopted by the lawyers in the trial court are not always decisive of the real point involved in the case as made by the record, and this court always reserves to itself the right to ignore the theory upon which the case was tried, in order to preserve the legal rights of the parties disclosed by the record of the pleadings and testimony in the case."

And again in Mississippi Power and Light Company v. Pitts, 181 Miss. 344, 179 So. 363, 365, it was said: "courts decide according to any of the alternatives they think tenable, or may decide according to a view of the law not argued at all, or even upon a point or points which counsel for both sides contend has nothing to do with the case. * * * it is the pleadings and the developed facts within the pleadings that courts are obliged to follow and to which the parties and counsel must be held * * *." See also Wilson v. Alabama G. S. Railroad Co., 77 Miss. 714, 28 So. 567, 52 L.R.A. 357.

The appellees secured, in the court below, all of the relief which they sought, in spite of the fact that they carried a heavier burden than should have been required of them, according to our decision. Since they did not

seek any further relief, why should it be incumbent upon them to prosecute a cross-appeal? Should they be required to prosecute an appeal themselves, even though they had obtained all the relief desired, in order to say that the action of the court was correct on the theory tried, but if wrong in that contention, at any rate, the issue should have been submitted on respondeat superior, and, in any event, the right result was reached?

In Caston v. Caston, 54 Miss. 512, it was said: ''When a complainant obtains a decree, but not for all the relief prayed for by his bill; and the respondent appeals, if the complainant desires a more favorable decree he must enter a cross-appeal, so that he may be heard when the decree is considered by the Supreme Court.''

Appellant was under the duty to plead and prove its immunity as a charitable institution, even under the rule existing prior to the announcement in this case. It attempted to do both. The facts were stated in the original opinion with such sufficiency that it is not necessary to reiterate them here. Therefore, the denial of a new trial on that account does not deny due process, nor does it deprive the appellant of its day in court.

The original opinion states fully the position of the court in declaring that reference to insurance did not amount to prejudicial or reversible error.

It therefore follows that the suggestion of error ought to be, and is, overruled.

Suggestion of error overruled.

**Roberds, J.,** took no part.