Beverly GRANGER, Plaintiff and
Respondent,

v.

DEACONESS HOSPITAL OF GRAND
FORKS, Defendant and Appellant.

No. 8185.

Supreme Court of North Dakota.

Nov. 23, 1965.

Mart R. Vogel, Fargo, and H. G. Ruemmele, Grand Forks, for appellant.

Samuel Rubin, Grand Forks, and Alan L. Stiegler, Minneapolis, Minn., for respondent.

ERICKSTAD, Judge (on reassignment).

This is an appeal from an order of the District Court of Grand Forks County dated April 21, 1964, granting the motions of the plaintiff, Beverly Granger, to: (1) strike the defense of charitable immunity contained in the answer of the defendant, Deaconess Hospital of Grand Forks; (2) suppress any reference to the plaintiff's testimony before the Grand Forks County Welfare Board; and (3) deny the defendant's request to compel further depositions of the plaintiff for discovery purposes.

In this case the plaintiff sued the defendant hospital, alleging that while she was a patient in the hospital and under sedation, the hospital, through its agents, servants, and employees, negligently permitted her to smoke while lying in bed, resulting in a fire which seriously burned her, causing massive bodily injuries. The defendant included in its answer an affirmative defense that it was a charitable corporation dedicated to the relief of pain and suffering; that it is a nonprofit organization and that no part of its earnings or income have ever been or are diverted from charitable purposes, and that, as a consequence thereof, the defendant is free from tort liability under the laws of North Dakota.

The first issue which we shall consider is the defendant's appeal from that part of the trial court's order which struck the defendant's affirmative defense of charitable immunity.

■ The order granting the motion to strike the defense of charitable immunity from the answer is appealable because it strikes an affirmative defense not provable under the remaining allegations of the answer. See La Duke v. E. W. Wylie Co., 77 N.D. 592, 44 N.W.2d 204.

An order which strikes from an answer an affirmative defense not provable under the remaining allegations of the answer, is an appealable order.

La Duke v. E. W. Wylie Co., supra, Syllabus No. 1.

In La Duke this court said:

* * * The appealability of the order depends upon the nature of the material stricken. If it involves the merits of the action or a part thereof, it falls within our statutory provision, but a rule of thumb is not always available to determine when an order involves the merits. It is clear that the merits are not involved when the order strikes out irrelevant or redundant matter. Upon the other hand it is equally clear that if the order strikes an affirmative defense not provable under the remaining allegations of the answer it is appealable. * * *

La Duke v. E. W. Wylie Co., supra, 44 N.W.2d at 206.

■ Having held that that part of the order granting the motion to strike the defense of charitable immunity from the answer is appealable, we must now determine whether a charitable nonprofit corporate hospital is liable to a patient for injuries caused the patient through the negligence of its employees.

✓ Although we are cognizant of the dicta contained in two early decisions of this court, namely, Fawcett v. Ryder, 23 N.D. 20, 135 N.W. 800, and Boetcher v. Budd, 61 N.D. 50, 237 N.W. 650, in which this court held that private hospitals operated for profit were liable for injuries caused a patient but inferred that a different rule might apply in the case of a charitable institution, we believe that this court determined the rule to be otherwise in the case of Rickbeil v. Grafton Deaconess Hospital, 74 N.D. 525, 23 N.W.2d 247, 166 A.L.R. 99.

That case involved an action for libel brought by someone other than a patient against a charitable nonprofit corporate hospital. In holding the hospital liable, this court said:

Title 10 of the Rev.Code deals with corporations, and sec. 10–0101 pro-

vides: "The provisions of this title shall apply to all corporations other than public corporations unless, *from the context of any statute,* a different intention plainly appears." * * * This title provides (sec. 10–0107) that, "Every corporation, as such, has power, * * * to sue and be sued in any court; * * *." Chap. 10–08 of the title refers to benevolent corporations, not organized for profit, and nowhere therein do we find any exemption from liability for torts of agents. Law reports are full of cases where judgments are entered against hospitals for torts of employees. In the absence of statutory exemption, a non-profit corporation is liable for its torts the same as any other corporation. "A hospital, whether private or charitable, is liable to a patient for the torts of its employees under the doctrine of 'respondeat superior.'" St. Paul-Mercury Indemnity Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N.W.2d 637. Thus there is no exemption from liability merely because the hospital is a private institution or a charitable institution.

\* \* \* \* \* \*

As we have pointed out there is no statutory immunity in this state. To release any corporation of the type involved from immunity for torts requires judicial legislation. * * *

Rickbeil v. Grafton Deaconess Hospital, supra, 23 N.W.2d at 258–259.

As we have never applied the doctrine of charitable immunity in our state, the case of Michael v. Hahnemann Medical College & Hospital, 404 Pa. 424, 172 A.2d 769, referred to us by the appellant for its statement on the importance of stare decisis, can have no bearing.

In Rickbeil, in acknowledging that courts are not in accord with reference to the liability of certain charitable hospitals, particularly those created and maintained by trusts, this court cited the case of Greatrex

v. Evangelical Deaconess Hospital, 261 Mich. 327, 246 N.W. 137, 86 A.L.R. 487, as saying:

 * * * [I]mmunity of charitable hospitals was declared because of trust situation where hospital authorities exercised reasonable care of selection of employees and because of the waiver theory.

It is significant that since Rickbeil the Michigan Supreme Court has overruled Greatrex in the case of Parker v. Port Huron Hospital, 361 Mich. 1, 105 N.W.2d 1, decided in 1960.

In overruling Greatrex and other decisions which followed it in the State of Michigan, the Michigan Supreme Court quoted at length Justice Rutledge's opinion in President and Dir. of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810 (1942).

Because of the excellence of the discussion of the doctrine of charitable immunity by Justice Rutledge, we would like to quote him also:

 * * * The doctrine of immunity of charitable corporations found its way into the law, like the so-called "trust fund" doctrine in the law of private business corporations, through misconception or misapplication of previously established principles.

The foundation of immunity in this country is the dictum of Lord Cottenham in The Feoffees of Heriot's Hospital v. Ross, 1846, 12 Clark & Fin. 507, 513, 8 Eng.Reprint 1508: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose." The action was for damages for wrongful exclusion from the benefits of the charity, not for personal injury inflicted in its operation. Previously, in Duncan v. Findlater, 1839, 6 Clark & Fin. 894, 7 Eng.Reprint 934, the

same judge had uttered a similar dictum, and this was followed in Holliday v. St. Leonard, 1861, 11 C.B.,N.S., 192. However, the dictum of Duncan v. Findlater was overruled by Mersey Docks Trustees v. Gibbs, [1866] L.R. 1 H.L. 93, and the ruling of Holliday v. St. Leonard was reversed by Foreman v. Mayor of Canterbury, [1871] L.R. 6 Q.B. 214.

In this state of the English decisions, Massachusetts adopted the repudiated rule of Holliday v. St. Leonard in McDonald v. Massachusetts General Hospital, 1876, 120 Mass. 432, 21 Am.Rep. 529, and Maryland followed Heriot's case in Perry v. House of Refuge, 1885, 63 Md. 20, 52 Am.Rep. 495. Apparently both courts acted in ignorance of the English reversal. In any event, they resurrected in America a rule already dead in England, and thereby gave Lord Cottenham's dictum a new lease on life in the New World.

* * * [A] rule of absolute immunity which grew out of dicta pointing the plaintiff to another source of recovery and involved an application or misapplication, as may have been the case, of the law of trusts to a corporate situation, hardly gains permanence from its origin. When to these facts are added its early reversal, and its acceptance in this country in disregard or ignorance of that fact, the historical foundation crumbles. * * *

*     *     *     *     *     *

It is doubtful that the so-called "rule" of full immunity ever represented the prevailing state of decision in this country. Conflict has existed from the beginning. Rhode Island repudiated the immunity just when Massachusetts and Maryland were adopting it. Glavin v. Rhode Island Hospital, 1879, 12 R.I. 411, 34 Am.Rep. 675. Nevertheless judicial discussion has set in the pattern that immunity is the

rule, much of it without explicit recognition that the "rule" itself is an exception to general principles of liability.

Notwithstanding the pattern, the "rule" has not held in the tests of time and decision. Judged by results, it has been devoured in "exceptions." Debate has gone on constantly, not so much as to whether, but concerning how far it should be "modified," with ever widening modification.

President and Dir. of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810 at 815–817 (1942).

Justice Rutledge reviewed some of the reasons and policies supporting and working against general immunity as follows:

For it are various commonly advanced arguments: Liability would violate the donor's intention; misappropriate the funds to unauthorized purposes and to persons not within the intended class of beneficiaries; and in effect indemnify the trustees, if the charity is organized as a trust, against the consequences of their own or their subordinate's misconduct. More persuasive apparently, but hardly more substantial, are the frequently expressed fears that imposing liability would dissipate the fund in damages and deprive the favored class or the public of the charity's benefit. A variant is the assumed danger that donors would be deterred from creating the charity and from adding to its funds by subsequent donations. Other considerations are mentioned, but these are the principal ones.

The confusion comes to climax when attempt is made to modify the rule in some of the ways previously mentioned and to reconcile the modifications with these reasons. It seems not to be recognized that all apply with equal force, on any basis of logic, whether the violation, misappropriation, dissi-

pation or deterrence takes place through the negligent action of (1) the board of directors, (2) the principal or managing officers, (3) the operating superiors, as distinguished from the managers of finance and general policy, or (4) employees and representatives generally acting within their actual or apparent functions. There is the same failure to see that dissipation and deterrence also take place equally, whether damages are paid to a stranger or to a beneficiary and regardless of who falls within each class. Damage suits by employees, visitors, special nurses, physicians, and members of the general public are apt to be as frequent and as serious as those by patients. If, too, the donor's intention is controlling and he does not intend the fund to be expended for damages, but only for the purposes he specifies, the violation of his intention and the misappropriation from the objects of the trust are as great when a "stranger" collects damages as when a patient does.

These reasons therefore are not consistent with any of the modifications ordinarily made. They support general exemption and they negative one form or instance of immunity as much as another. The only sound arguments from them would be, first, for total immunity; second, for selection of the smallest class of claimants and the smallest or least-likely-to-be negligent group of agents or representatives, to whom and by whom liability would be incurred. The latter would reduce to the minimum the volume of dissipation and the deterrent effect, but would not escape, in a logical sense, violation of the donor's intention or the ultra vires effect of so applying the fund.

Taking the reasons for their logical consequence—total immunity—we find them not convincing in the light of modern conditions, both in the law and in philanthropy. Whatever its form, the doctrine of ultra vires, so strong in the nineteenth century, has shrunk constantly both in the law of private corporations and in that of trusts. This is true especially concerning responsibility for tort. From authority as a controlling premise, no corporation and no trust could possibly be guilty of tort. Corporate charters and trust indentures do not authorize corporate representatives or trustees to commit assaults, libel, slander, and negligent torts. But authority has given way to respondeat superior and "course of employment," for reasons not necessary to restate, in the highly organized society of this century. The surrender has been greater by corporations than by trusts, but with the latters' advent into business the old lines of limitation have been shaken. Breaches have been made too in the trustee's inability to secure indemnity from the fund and in the claimant's inability to reach it. Apart from charity organized in trust or corporate form, the law of ultra vires action as defeating liability has moved on from *authorized* [emphasis by Justice Rutledge] action to conduct incidental to the enterprise and the actual or apparent function of the actor as the line of demarcation. There is no longer the same broad climate of exemption as existed when the "rule" of immunity for charitable institutions took form. Nor is the law of negligence in its swaddling clothes as it was then.

There are also reasons which take force away from the fears of dissipation and deterrence of donations. No statistical evidence has been presented to show that the mortality or crippling of charities has been greater in states which impose full or partial liability than where complete or substantially full immunity is given. Nor is there evidence that deterrence of donation has been greater in the former. Charities seem to survive and increase in both, with little apparent heed to wheth-

er they are liable for torts or difference in survival capacity.

Further, if there is danger of dissipation, insurance is now available to guard against it and prudent management will provide the protection. It is highly doubtful that any substantial charity would be destroyed or donation deterred by the cost required to pay the premiums. While insurance should not, perhaps, be made a criterion of responsibility, its prevalence and low cost are important considerations in evaluating the fears, or supposed ones, of dissipation or deterrence. What is at stake, so far as the charity is concerned, is the cost of reasonable protection, the amount of the insurance premium as an added burden on its finances, not the awarding over in damages of its entire assets.

Against this, we weigh the cost to the victim of bearing the full burden of his injury. In line with this view may be mentioned the general extension of workmen's compensation acts and social security legislation to include the employees of charitable institutions. Also, as some of the more recent cases point out, much of modern charity or philanthropy is "big business" in its field. It therefore has a capacity for absorption of loss which did not exist in the typical nineteenth century small hospital or college. While the larger hospitals generally are not operated for profit, much of their revenue comes from paying patients, who are either not at all or are only partially beneficiaries on a charitable basis. To that extent, perhaps, the institutions should not be regarded as charitable and the paying patient, if he is injured and cannot recover, pays twice that others may have healing where he has injury.

Finally, in recent years the real deterrents to donation have been taxation, despite contrary inducements in deductions, and the fears of persons well placed for the future of large individual accumulations of property, arising from economic trends much more fundamental than making charitable institutions liable for their torts.

The chief arguments, therefore, for sustaining the immunity, namely, ultra vires action marked out by authority or intent of the donor and danger of destroying or preventing the creation of charitable institutions, no longer have, if they ever had, compelling effect. Changes in the law and in the organization and mores of community life have taken away their major force. That is true, whether for full or for modified immunity.

As against the factors favoring it, may be mentioned the tendency of immunity to foster neglect and of liability to induce care and caution; the departure from the general rule of liability; the anomaly of exempting charitable corporations and trust funds, when charity is not a defense to others; the injustice of giving benefit to some at the cost of injury to others and of the injured individual's having to bear the loss wrongfully inflicted upon him, at a time when the direction of the law is toward social distribution of losses through liability for fault, liability without fault, and legislation which gives the person disabled to work what is commonly but inaccurately called "social" security. There are others we do not stop to mention.

It is hardly necessary to discuss the various theories of exemption or their application in various modifications. Whether immunity be founded on the "trust fund" theory, the rule of respondeat superior, so-called "public policy," or the more indefensible doctrine of "implied waiver," is not for us a controlling consideration. At bottom, except possibly for the last, these come down to the same thing, supported by

the same considerations. They are merely different names for the same idea, cast according to the predilection of the user for technical or for broader terminology. The "trust fund theory" comprehends all that is involved in "public policy," with only an apparent difference in approach. This is true likewise of "respondeat superior" and "implied waiver." In any event the result is a departure from general, and we think right, principles of liability. The differences in foundation do not affect even the extent of the departure. We think it should be complete and that charitable corporations should respond as others do for the wrongs inflicted by persons who act in their behalf about their business and within the course of their duties, actual or apparent. Immunity, whether full or partial, is to be granted only when compelling reason requires it. If there has been, there is no longer such reason. The reasons which support governmental immunity, where it remains, are largely different, but even so they too give way gradually to liability imposed or permitted by legislation.

President and Dir. of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810, at 822–824 (1942).

■ The appellant hospital has indicated that a distinction should be made between a stranger to and a beneficiary of a charitable corporate hospital. We believe that Justice Rutledge's discussion of that topic is significant:

We think it does not matter whether the plaintiff is stranger or beneficiary. Whether the one or the other is denied recovery, the distinction is without justice or legal justification. To give it to a stranger but not to a beneficiary makes the latter accept succor at the risk of greater harm. When it occurs he bears a burden which should fall on all alike, not on him alone. On the other hand, no one has the right to have cure or care at the cost of harm inflicted upon another. To allow recovery to the beneficiary, but deny it to the stranger, would unload on the latter in some part not only the cost of care and cure, but the cost of injury to the former.

Furthermore, it is not easy to hew to the line and the chips do not fall consistently where they should lie. The distinction is not tenable upon any of the foundations asserted to support the immunity. Because the court's division is on this line, we spell out the matter, though others have done it beyond need of repetition.

If immunity is founded on some form of ultra vires premise, there is no room for treating strangers and beneficiaries differently. Paying damages "violates the donors [assumed] intention" and "misappropriates the fund to unauthorized purposes" as much in one case as in the other. If the matter is regarded as "diverting the fund to persons not within the class intended for aid," it is impossible to assume that the donor intends everyone except the special object of his bounty to have reparation. If any assumption were justified, it would be exactly the contrary one. In reason the departure, in this respect, would be the greater when a stranger recovers. The person for whom the charity is founded at least is within the donor's contemplation, as the stranger may not be. And he is there as an object of help, not as one whose last state is to be made worse than his first. The distinction therefore applies ultra vires backwards and doing so undermines that narrow premise entirely.

No more tenable foundation exists in considerations of preserving the fund, preventing its dissipation, depriving the intended class or the public of its succor, cutting off creative or sustaining donations, and the like. The reasons already stated to show that these do not support unqualified immunity apply with equal force to a limited one, whatever its form

or extent. If damages dissipate the fund or deter donations, they do so equally whether paid to a stranger or to a beneficiary. When account is taken of the numbers in both classes and the probable burden of risk toward each, the heavier risk perhaps is incurred in favor of strangers.

In hospitals, for instance, the stranger group generally includes all except patients, in some states all except non-paying patients. Physicians, nurses, including special ones, those regularly employed and others in training, orderlies, laboratory technicians and assistants, business officers and office employees, maids, janitors, kitchen and cleaning help, all who render aid to the patient directly or indirectly, make their livelihoods doing so, and carry on the work of the institution, are within the "stranger" class. So is the minister or priest who comes to give comfort or administer the last sacrament. Likewise the relative, friend or stranger who visits the sick. Delivery men and others who have business to do on the premises may recover if they are injured. The ambulance driver or operator of the hospital's truck is protected, as is the person he negligently runs down on the street. All these the distinction favors at the expense of the only person the fund is created and maintained to aid. He alone is excluded. He alone enters at the risk of life and limb, of illness or injury to be aggravated, when he seeks cure, by the careless conduct of others who themselves are protected against like risk.

If preservation of the fund or encouragement of donation required immunity, neither could justify the distinction. If the charity can assume the risk as to all the rest of the world and survive, it can do so for those it is designed to help. Neither the number of claims nor their amount will be greater in their behalf than for others. It is probable both would be smaller, because the class is so and because it is present in circumstances ordinarily conducive to precaution and care.

The remaining foundations also crumble under the distinction. Inappropriate to the charitable corporation, as has been shown, is the idea that recovery in effect indemnifies the trustees against the consequences of their own or their subordinates' wrongs. It is equally so whether stranger or beneficiary is reimbursed.

Finally, the idea of waiver is advanced, namely, that the beneficiary by accepting the tendered aid impliedly agrees that is all he may accept and waives any right of recourse for wrong done, while strangers do not do so. The notion that there is any such agreement or waiver is entirely fictional. In some instances the fiction is based upon impossibility, as when a patient is unconscious from whatever cause when he enters. So, also, when he is received not by arrangement of his own but of others and has no voice or choice in the terms. Infants of tender years, if not those more mature, and insane persons have no legal capacity so to will away their rights. Nor does the ordinary conscious adult intend to do so. Usually he is ill or hurt. He does not haggle about terms. He expects care, not carelessness. Few hospitals would announce a policy of requiring such a waiver as a condition of entrance, and few patients would enter under such a condition unless forced to do so by poverty. In that case there could be no real choice. The idea of waiver, therefore, as implied from reception of benefit amounts merely to imposing immunity as a rule of law in the guise of assumed contract or renunciation of right, when all other reasons are found insufficient to support the distinction. When the benefit turns into injury which aggravates the original ill, all basis for the waiver and all "consideration" for it fail.

It remains only to point out more fully the effects of the conflict in deciding who is stranger and who is beneficiary.

The patient cannot recover, but the visiting spouse or parent may do so, notwithstanding he may pay the patient's bills. The visitor is an invitee, the patient is in a class worse placed than the trespasser. Cf. Radio Cab, Inc., v. Houser, [76] U.S.App.D.C. [35], 128 F.2d 604, 1942. The physician receives facilities for conducting his work. He seldom, if ever, pays for hospital connections. Often he is paid for accepting them. Without them he is worse than a ship without a rudder. Yet he is "stranger," not "beneficiary." So it is with nurses, orderlies, maids, and all who do the hospital's work. They receive livelihood from it year after year, perhaps for a lifetime, while the patient normally remains only for days or weeks. Yet they are "strangers," he is "beneficiary." Hospitals and schools are notably dependent upon income received from paying patients and students. Some pay the full cost of their care, except that overhead figured per capita for all, paying and nonpaying, makes an apparent deficiency. Others who pay only in part are beneficiaries only in part. Without these funds the institution could not operate. Beneficiaries who pay have a share in maintaining the fund and the work.

Abolition of the immunity as to the paying patient is justified as the last short step but one to extinction. Retention for the nonpaying patient is the least defensible and most unfortunate of the distinction's refinements. He, least of all, is able to bear the burden. More than all others, he has no choice. He is the last person the donor would wish to go without indemnity. With everyone else protected, the additional burden of protecting him cannot break the trust. He should be the first to have reparation, not last and least among those who receive it. So stripped of foundation, the distinction falls. It should fall in line with, and not away from, the trend which has brought it about. The immunity should go and the object of the charity should be placed on a par with all others.

President and Dir. of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810 at 825–827 (1942).

It is interesting to note that the Michigan court in Parker included North Dakota among the states which they found to have abolished whatever immunity they previously had:

Since 1942, the year in which President and Directors of Georgetown College v. Hughes, supra, was decided, the following jurisdictions have abolished whatever immunity rule they previously had: Alaska; Arizona; California; Delaware; Idaho; Iowa; Kansas; Minnesota; Mississippi; New Hampshire; North Dakota; New Jersey; New York; Ohio; Puerto Rico; Vermont; and Washington. Today these and most of the other States of the nation, having abolished the immunity rule, are now governed by the general doctrine of respondeat superior as far as liability for torts of employees and agents of charitable corporations are concerned.

Parker v. Port Huron Hospital, 361 Mich. 1, 105 N.W.2d 1, at 13.

In 1950 the Supreme Court of Iowa said:

It is our considered judgment that incorporated charity should respond as do private individuals, business corporations, and others, when it does good in the wrong way. * * *

Haynes v. Presbyterian Hospital Ass'n, 241 Iowa 1269, 45 N.W.2d 151, at 154.

The Supreme Court of Wisconsin, in overruling its previous decisions, said:

The defendant insists that if the rule be changed it should be done by the legislature and not by the court. This is upon the theory that questions of public policy are to be determined by

the legislature. If that were strictly true then perhaps this court was in error in adopting the doctrine of charitable immunity in the first place. We do not think that is true. We believe the court was justified in acting as it did in 1917 in view of conditions as they then existed. The rule of *stare decisis*, however desirable from the standpoint of certainty and stability, does not require us to perpetuate a doctrine that should no longer be applicable in view of the changes in present day charitable hospitals. They are now larger in size, better endowed, and on a more sound economic basis. Insurance covering their liability is available and prudent management would dictate that such protection be purchased.
Kojis v. Doctors Hospital, 12 Wis.2d 367, 107 N.W.2d 131, at 133–134.

In a case concerning the validity of a release from liability for future negligence, imposed as a condition for admission to a charitable research hospital, the California Supreme Court said:

We must note, finally, that the integrated and specialized society of today, structured upon mutual dependency, cannot rigidly narrow the concept of the public interest. From the observance of simple standards of due care in the driving of a car to the performance of the high standards of hospital practice, the individual citizen must be completely dependent upon the responsibility of others. The fabric of this pattern is so closely woven that the snarling of a single thread affects the whole. We cannot lightly accept a sought immunity from careless failure to provide the hospital service upon which many must depend. Even if the hospital's doors are open only to those in a specialized category, the hospital cannot claim isolated immunity in the interdependent community of our time. It, too, is part of the social fabric, and prearranged exculpation from its negligence must partly rend the pattern and necessarily affect the public interest.

Tunkl v. Regents of University of California, 60 Cal.2d 92, 32 Cal.Rptr. 33, at 40, 383 P.2d 441, at 448.

The following discussion of charitable immunity is contained in American Law Reports, Annotated:

In addition to the grounds relied upon in rejecting the specific theories in support of the immunity, the courts advocating abandonment of the immunity rule have pointed out that this rule found its way into the law through misconception or misapplication of previously established principles; that it is doubtful whether the administration of justice has ever been well served by the rule; that, in any event, the rule has become outmoded and is an anachronism; that it is a principle of law, as well as of morals, that men must be just before they are generous; that a charity should not be permitted to inflict injury upon some without the right of redress, in order to bestow charity upon others because the result would be to compel the victim to contribute to the charity against his will; that the law's emphasis generally is on liability, rather than immunity, for wrongdoing, and that, in particular, the modern tendency of the law is to shift the burden from the innocent victim to the community at large, and to distribute losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than to leave them wholly to be borne by those who sustained them; that immunity tends to foster neglect while liability tends to induce care and caution; that all persons, organizations, and corporations stand on an equality before the law, and all should be bound alike or excused alike; that the charitable nature of a tortfeasor cannot place it beyond the law appli-

cable to all; and that protection of life and limb by organized society is of greater importance to mankind than any species of charity and is superior to property rights.
Annot., 25 A.L.R.2d 58–60 (1952).

We conclude that the trial court was correct in striking the defense of charitable immunity from the answer. A charitable nonprofit corporate hospital is liable to a patient for the torts of its employees.

The next issue with which we are presented involves the appellant's claim that the trial court erred in suppressing all testimony of the plaintiff in connection with a proceeding before the Public Welfare Board of Grand Forks County, which was then considering whether to pay for the hospital costs of the plaintiff. The court suppressed this evidence on the ground that it was confidential and privileged.

■ Without deciding whether the testimony before the Welfare Board is privileged, we sustain the trial court on the ground that suppressing reference to that testimony by its intermediate order was not appealable. This is supported by our decision in Kennelly v. Northern Pac. R. Co., 41 N.D. 395, 170 N.W. 868, in which we held that an order sustaining exceptions to and suppressing a deposition is not appealable, as it is, in effect, merely a ruling upon evidence. That is not to say that it, as an intermediate ruling, is not ultimately reviewable upon an appeal from the final judgment. Stormon v. District Court of Pierce County, 76 N.D. 713, 38 N.W.2d 785, at 787. At this point we have not reached that stage of the proceedings, and the trial court's ruling suppressing this testimony is affirmed.

■ The final issue confronting us is whether the trial court erred in denying the defendant's request to compel further depositions of the plaintiff for discovery purposes.

Our view is that this ruling of the trial court should also be sustained for the same reasons given for sustaining the trial court's ruling suppressing all reference to the testimony of the plaintiff before the Welfare Board. Interlocutory orders are not appealable unless made so by statute. Neither of these appeals come within the cases authorized by § 28–27–02, N.D.C.C.

In affirming an order of the trial court sustaining plaintiff's objections to questions during her deposition on oral examination by the defendant, the Appellate Court of Illinois said:

> * * * Allowance of these appeals would be to promote piecemealing to a high degree and a step backward in the quest of the Illinois Legislature and courts for more modern, efficient procedures. * * *

Galler v. Galler, 24 Ill.App.2d 183, 164 N.E.2d 526, at 527.

In a 1963 decision of the United States Court of Appeals, it said:

> The appeal is from an order of the District Court overruling motions to require some witnesses to answer certain questions asked of them in depositions taken by the plaintiff (here appellant) for discovery purposes under Rule 26(a), Federal Rules of Civil Procedure, 28 U.S.C.A. The defendants (here appellees) have filed a motion to dismiss the appeal for want of a final order or judgment. The motion to dismiss is granted.

> Rulings on the propriety or impropriety of incidents of deposition taking under Rule 26 in a pending suit are not "final decisions" within the general right of appeal provided by 28 U.S.C.A. § 1291. Whatever practically may be their significance as a matter of discovery, they do not legally dispose of the issues of the case. Like other steps of preliminary progression, or like the incidents of a trial, they cannot be made the subject of review under § 1291, except after and in relation to the terminating order or judg-

ment in the case. Cf. Alexander v. United States, 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686; Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783; Thomas French & Sons v. International Braid Co., 1 Cir., 146 F. 2d 735; Dille v. Carter Oil Co., 10 Cir., 174 F.2d 318.

Cimijotti v. Paulsen, 323 F.2d 716 (8th Cir. 1963), at 717.

For the reasons stated the appeal is dismissed, and the order of the trial court is in all things affirmed.

BURKE, C. J., and STRUTZ and TEIGEN, JJ., concur.

KNUDSON, J., not being a member of the Court at the time of submission of this case, did not participate.